Wayne DeMARCO et al.

v.

TRAVELERS INSURANCE
COMPANY et al.

No. 2008–334–Appeal.

Supreme Court of Rhode Island.

July 12, 2011.

Robert A. D'Amico, II, Providence, for Plaintiff.

Anthony Zelle, Esq., Pro Hac Vice, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

What are the responsibilities of an insurance company when a single motor vehicle collision results in multiple claims being asserted against the insureds, which claims in the aggregate exceed the policy limits? That, in essence, is the question that this appeal calls upon us to answer.

The defendant, Travelers Insurance Company (Travelers),[1] appeals from the Superior Court's grant of partial summary judgment in favor of the plaintiff, Wayne DeMarco.[2] On appeal, Travelers contends that in so ruling the hearing justice erred for two primary reasons, viz.: (1) that the plaintiff's release of the individual and the corporation insured by Travelers and/or

---

1. We note that defendant insurance company's brief indicates that its proper name is "Travelers Indemnity Company." However, the name used in the caption of this opinion is identical to what appears on the notice of appeal. In any event, it has not been asserted that this technical issue of nomenclature is of any real relevance to the issues before us.

2. The plaintiffs in this action are Wayne DeMarco and his wife, Leesa DeMarco, individually and as parents and legal guardians of two minor children and also as assignees of Leo H. Doire and Virginia Transportation Corp. For the sake of simplicity and following the lead of several of the documents in the record, we shall refer to the DeMarcos collectively as "plaintiff" or as "Mr. DeMarco."

the existence of what the parties refer to as a "judgment satisfied order" extinguished any claim against Travelers that might have been assigned to the plaintiff by the insureds; and (2) that the record contains facts on the basis of which a finder of fact could conclude that Travelers acted reasonably and in its insureds' best interests in dealing with this particular multiple claimant case. Travelers contends that the Superior Court's order granting partial summary judgment should be vacated and that this Court should direct that summary judgment be entered in Travelers' favor.

For the reasons set forth below, we deem the grant of partial summary judgment in plaintiff's favor as to Travelers' liability pursuant to the principles set forth in *Asermely v. Allstate Insurance Co.*[3] to have been unwarranted in view of the state of the record at that time. However, we affirm the ruling of the hearing justice with respect to the applicability of the rejected settlement offer statute in the multiple claimant context. Accordingly,

we shall remand the case to the Superior Court for further proceedings consistent with this opinion.[4]

## I

### Facts and Travel

On September 10, 2003, Wayne DeMarco was seriously injured in a collision while traveling as a passenger in a motor vehicle owned by Virginia Transportation Corp. (Virginia Transportation) and operated by that company's owner, Leo H. Doire, when the vehicle veered off the road and struck two utility poles.[5] A second passenger, Paul Woscyna, was also seriously injured; in addition, the public utility then known as The Narragansett Electric Company[6] sustained property damage as a result of its utility poles having been struck. At the time of the collision, the vehicle in which Mr. DeMarco was a passenger was insured by defendant Travelers; significantly, the Travelers policy had liability limits of $1 million.[7]

---

**3.** *Asermely v. Allstate Insurance Co.*, 728 A.2d 461 (R.I.1999).

**4.** We wish to express our gratitude to the American Insurance Association, the Property Casualty Insurers Association of America, and the Rhode Island Association for Justice for the helpful and informative briefs that they submitted to this Court as *amici curiae*.

**5.** Although the point is ultimately of no real relevance to the issues on appeal, we are aware that some documents in the record state that only one utility pole sustained damage.

**6.** The Narragansett Electric Company currently does business as National Grid USA Service Company, Inc. We shall hereinafter refer to the company simply as "National Grid."

In September of 2006, National Grid commenced a civil action against Travelers' insureds (Virginia Transportation and Mr.

Doire) with respect to the damage to the utility poles. That lawsuit was separate from the lawsuits brought by Mr. DeMarco and Mr. Woscyna that are relevant to this case and that will be discussed later in this opinion. In due course, Virginia Transportation and Mr. Doire negotiated an independent agreement with National Grid, whereby the utility's claim against them was settled by their expending an amount of their own money for that purpose; Travelers did not pay out any policy proceeds in connection with that settlement. For this reason, the property damage sustained by National Grid has no bearing on the intricate legal issues that this case requires us to analyze.

**7.** On November 4, 2003, Travelers' claim services director wrote to Mr. DeMarco's attorney in response to the attorney's inquiry about the limits of Virginia Transportation's liability coverage. The claim services director advised the attorney that the liability limit was what she described as a "$1,000,000 combined single limit" and that Travelers

## A

### Events Leading to the Trial of the Personal Injury Action Against Travelers' Insureds

On February 2, 2004 (less than six months after the collision), Mr. DeMarco's attorney submitted to Travelers' claim services director a demand letter seeking the payment of $1 million (the policy limits) to plaintiff. The letter stated that the attorney was still in the process of obtaining Mr. DeMarco's "voluminous medical records and bills," but the letter also indicated that hospital bills totaling $190,932.56 had already been sent to Travelers. In that February 2 letter, plaintiff's attorney also stated that she was enclosing "a courtesy copy of the lawsuit that [she intended] to file within 14 days of the date of [the] letter," and she requested that Travelers "review and advise."

On February 25, 2004, plaintiff's attorney sent another letter to Travelers' claim services director, stating that "we believe that our client's claim for personal injuries far exceeds your insured's [sic] liability coverage policy limit;" the attorney demanded that her client's claim be settled in the amount of the policy limits. The attorney went on to state that, if Travelers did not agree to settle in accordance with plaintiff's demand, the insurance company might be exposed to liability for damages in excess of the policy limits and for interest. In support of that assertion, plaintiff's attorney explicitly cited this Court's opinion in the case of *Asermely v. Allstate Insurance Co.*, 728 A.2d 461 (R.I.1999); the attorney stated in her letter that the *Asermely* opinion set forth principles relative to an insurance company's potential responsibility for such excess damages and for interest. The letter then quoted from the *Asermely* opinion, including the language stating that an insurance company's fiduciary obligation extends not only to its insureds but also to a party to whom the insureds have assigned their rights. The letter from plaintiff's attorney also quoted the language in the *Asermely* opinion which states that an insurance company must seriously consider a plaintiff's reasonable written offer to settle within policy limits and which also states that, if the insurer declines to settle, it will be liable for an eventual judgment against its insureds in excess of the policy limits (unless it can show that the insureds were unwilling to accept the offer of settlement).[8]

---

was unaware of any excess coverage available to its insureds.

8. The February 25, 2004 letter from plaintiff's attorney to Travelers reads in pertinent part as follows:

"The Rhode Island Supreme Court recently defined an insurance company's responsibility in this regard in *Asermely v. Allstate Insurance Company* (7[28] A.2d 461) (R.I. 1999) as follows:

"[The Rhode Island Supreme Court] has held that an insurance company has a fiduciary obligation to act in the 'best interests' of its insured in order to protect the insured from excess liability * * * [and to] refrain from acts that demonstrate greater concern for the insurer's monetary interests than the financial risk attendant to the insured's situation. *Medical Malpractice Joint Underwriting Association of Rhode Island v. Rhode Island Insurers' Insolvency Fund*, 703 A.2d 1097, 1102 (R.I.1997). This fiduciary obligation extends not only to the insurance company's own insured, but also, as in this case, to a party to whom the insureds have assigned their rights.

"It is not sufficient that the insurance company act in good faith. An insurance company's fiduciary obligations include a duty to consider seriously a plaintiff's reasonable offer to settle within the policy limits. Accordingly, if it has been afforded reasonable notice and if a plaintiff has made a reasonable written offer to a defendant's insurer to settle within the policy limits, the insurer is obligated to seriously consider such an offer. If the insurer declines to settle the case within the policy

On February 27, 2004, Travelers' claim services director sent a letter to plaintiff's attorney acknowledging receipt of plaintiff's February 2 demand letter. The claim services director stated that Travelers was "not in a position to make an offer to Mr. Demarco [sic] at this time," noting that the insurer had not yet received medical records describing Mr. DeMarco's injuries. The letter from Travelers went on to express the insurer's understanding that "there were multiple persons [9] who were seriously injured" as a result of the collision and that medical bills unrelated to Mr. DeMarco could equal or exceed his own. The letter from Travelers further stated that, under such circumstances, "Travelers [could not] exhaust its policy limit of $1 million by paying it to Mr. Demarco [sic]."

Nothing in the record indicates that Travelers responded to the February 25 demand letter from plaintiff's attorney, which had made explicit reference to the insurer's potential liability under Asermely.[10] However, on March 1, 2004, an attorney retained by Travelers (see footnote 12, infra) wrote to Travelers' claim services director to provide his legal opinion regarding Mr. DeMarco's demand for the policy limits. He stated that the claim services director should respond to Mr. DeMarco's demand letter, but he also expressed his view that the insurer was not at that time required to make a counter-offer. The attorney stated: "Generally, Asermely holds that an insurance carrier can be held liable in excess of its policy limits if it fails or refuses to settle a claim within its policy limits and a judgment is rendered that exceeds the policy limits." Nevertheless, in the same letter the attorney opined that, "under the circumstances of this case, Travelers will not be held liable for damages in excess of the policy limits." He acknowledged that Travelers had a duty under Asermely to settle within the policy limits; but he then stated that, since there was at least one other seriously injured party in addition to Mr. DeMarco, if Travelers were to pay the entire limits to Mr. DeMarco, such an action by Travelers could expose the insureds to personal liability stemming from non-DeMarco-related claims. The attorney noted that the Asermely opinion stated that an insurer had a fiduciary obligation to act in the best interests of its insured and to strive to protect the insured from excess liability, and the attorney expressed his view that "the payment of policy limits to one claimant may be a violation of Asermely that will expose Travelers to extra-contractual liability."

Shortly thereafter, on March 4, 2004, Mr. DeMarco commenced a personal injury action in the Superior Court for Provi-

limits, it does so at its peril in the event that a trial results in a judgment that exceeds the policy limits, including interest. If such a judgment is sustained on appeal or is unappealed, the insurer is liable for the amount that exceeds the policy limits, unless it can show that the insured was unwilling to accept the offer of settlement. The insurer's duty is a fiduciary obligation to act in the best interests of the insured. Even if the insurer believes in good faith that it has [a] legitimate defense against the third party, it must assume the risk of miscalculation if the ultimate judgment should exceed the policy limits." (Initial and final brackets added.)

9. Although in actuality only two persons were seriously injured as a result of the September 10, 2003 collision, the documents in this case often characterize the claimants as being "multiple." Such usage is not without authoritative support. See, e.g., The American Heritage Dictionary of the English Language 1155 (4th ed.2009) (defining the word "multiple" as "[h]aving, relating to, or consisting of more than one individual").

10. Travelers' letter of February 27, 2004 makes specific reference to the February 2 letter from plaintiff's attorney, but it makes absolutely no allusion to the letter of February 25.

dence County against Travelers' insureds—*viz.*, Virginia Transportation and Mr. Doire.[11]

Almost a year later, on February 7, 2005, plaintiff's attorney wrote to the attorney who had been retained by Travelers to represent its insureds in the personal injury litigation which plaintiff had commenced in March of 2004.[12] The plaintiff's attorney indicated that she was aware that Mr. Woscyna's attorney had submitted a settlement demand totaling $829,747 to Travelers, and she asked that the retained attorney advise Travelers' claim services director "that Mr. DeMarco is not yet done treating" and "that Mr. DeMarco's medical bills are five (5) times the amount of Mr. Woscyna's medical bills * * *." The plaintiff's attorney then observed: "That being said, I suspect that Mr. Woscyna's claim will not be resolved until Mr. DeMarco's claim is ready to be resolved." She concluded by asking the retained attorney to respond with his thoughts. The retained attorney responded in a letter dated February 23, 2005, in which he stated that he would like to take the deposition of Mr. DeMarco "so that we can be in the best position to assess the claim of each injured person;" a notice of deposition was enclosed.

On April 19, 2005, plaintiff's attorney sent a letter and copies of her client's medical records and bills to Travelers' retained attorney; the letter indicated that Mr. DeMarco had been discharged from his doctor's care on February 28, 2005. The plaintiff's attorney further asked the retained attorney to contact her so that they could discuss moving toward a resolution of the matter.

On June 7, 2005, plaintiff's attorney sent Travelers' retained attorney another letter, enclosing copies of Mr. DeMarco's tax returns and requesting that he "please advise if we can proceed towards arbitration or mediation."

On June 29, 2005, plaintiff's attorney once again wrote to Travelers' retained attorney and asked him to "advise if we are in a position to proceed with arbitration or mediation with the other claimant in this matter."

On July 22, 2005, plaintiff's attorney sent another letter to Travelers' retained attorney, offering to settle with the insurance company for $1 million (the policy limits). This letter included a detailed description of Mr. DeMarco's injuries, his course of treatment, his medical expenses, and his lost wages.

Neither Travelers nor the retained attorney responded to the several letters from plaintiff's attorney that we have just described. However, almost nine months later, on April 13, 2006, the retained attorney, having reviewed Mr. DeMarco's most recent production of documents in the personal injury litigation, wrote to Travelers'

---

11.  *Wayne DeMarco et al. v. Leo H. Doire and Virginia Transportation Corp.,* Civil Action No. PC 04–1171.

   Mr. Woscyna (the other person who was seriously injured in the September 10, 2003 collision) did not file a lawsuit against Virginia Transportation and Mr. Doire until August of 2006, approximately one month before the pertinent statute of limitations would have barred such an action.

12.  For the sake of simplicity, we shall hereinafter usually refer to the attorney retained by Travelers to represent its insureds in the personal injury litigation as the "retained attorney." It should be noted that this attorney also provided legal services relative to the personal injury litigation directly to Travelers itself; notably, he is the attorney who, in a letter dated March 1, 2004, presented his views to Travelers' claim services director regarding Mr. DeMarco's demand for the policy limits. (We have quoted liberally from that letter in the text, *supra*.)

claim services director in order to provide her with his evaluation of Mr. DeMarco's claim as compared with that of Mr. Woscyna. The retained attorney estimated that Mr. DeMarco's claim had "a value of approximately $885,000, including prejudgment interest * , * *." He stated that he had also reviewed the records and the demand provided to Travelers by Mr. Woscyna's attorney, and he estimated that the value of that claim would be at least as high as that of the DeMarco claim. The retained attorney recommended to the claim services director that, after any still-outstanding information regarding claims for property damage and personal injury was collected, Travelers should notify potential claimants that the combined value of all claims would "greatly exceed the policy limits." The retained attorney opined that "[s]o long as we offer the policy for all claimants to share on a pro rata basis, there will be no 'Asermely' problem;" he premised that opinion on the fact that the combined demands of Mr. DeMarco and Mr. Woscyna greatly exceeded the policy limit, which fact led him to conclude that the case did "not present an 'Asermely' situation." [13]

Approximately three months thereafter, on July 11, 2006, Travelers' retained attorney wrote to the attorneys representing Mr. DeMarco, Mr. Woscyna, and National Grid in order "to officially confirm that Travelers Insurance Company is offering its remaining policy limit of $995,000.00 * * * to be shared by your respective clients." [14] The letter from Travelers' retained attorney took no position as to how that sum of money should be divided; but it stated that, if the above-named claimants could not "decide amongst [them]selves" how it should be divided, Travelers would file an interpleader action and seek to deposit the $995,000 amount into the registry of the court.

On July 13, 2006, Mr. DeMarco's attorney responded to the July 11 letter from the retained attorney. [15] He pointed to the fact that Travelers had been aware of the severity of the collision since September of 2003. He then noted that, until it sent the letter of July 11, 2006, Travelers had not made any offers to settle during that almost three-year time span, despite the "repeated attempts" to settle that had been made on behalf of Mr. DeMarco. The attorney also noted that Travelers was aware that the personal injury trial was scheduled to begin on a date certain (*viz.*, September 18, 2006), and he stated that "[t]he failure of [Travelers] to make a good

13. The letter from Travelers' retained attorney to the claim services director reads in pertinent part as follows:
    "I do not see DeMarco's demand for $1,000,000 as presenting an 'Asermely' problem as that demand is for the policy limits in light of numerous other demands, including Woscyna's demand of $829,747.00. This case does not present an 'Asermely' situation. The first two demands thus far greatly exceed the available coverage.
    "I would like to foreclose any 'Asermely' problem[.] [That] can be accomplished by simply writing to the two claimants who have now submitted demands to inform them of the limited coverage of $1,000,000 and to total demands thus far that greatly exceed the available coverage. They should be made aware that the coverage is available but will only be paid when all claimants agree to a pro rata share of the available coverage."

14. The July 11, 2006 letter from the retained attorney explained that $5,000 of the $1 million policy limits had already been paid to Mr. DeMarco for "medical payments coverage."

15. Mr. DeMarco was at all pertinent times represented by the same law firm; but it appears that, at some point in 2006, an attorney in that firm other than the one who initially represented the client became actively involved in the representation.

faith effort to settle this claim within a reasonable period of time cannot now be cured by this eleventh hour attempt." The plaintiff's attorney further stated that he did not believe that Travelers' "eleventh hour" offer of the policy limits and its suggestion that the claimants "decide amongst [them]selves" how to divide it would "discharge Travelers' obligation under [*Asermely*], or otherwise relieve it from its responsibility to pay damages and interest well above the policy limit."[16]

On July 31, 2006, Travelers' retained attorney responded to the July 13 letter from plaintiff's attorney. He emphasized that plaintiff's attorney had limited himself to demanding the entire policy limits of $1 million, despite being aware of the fact that Travelers' policy limits were "only" $1 million and the fact that Mr. Woscyna had also been seriously injured and was making a claim under the policy. Travelers' retained attorney wrote that, as a result, Travelers and its insureds had been placed in an "impossible situation" because, in Travelers' view, Mr. DeMarco had never made any "reasonable offer to settle" in such a way that Travelers would be able to pay out the policy limits and not expose the assets of its insureds to other claims. The retained attorney further stated that he disagreed with the analysis of Mr. DeMarco's attorney "as to whether or not Travelers [had] failed to make a good faith effort to settle this case;" and he further expressed disagreement with Mr. DeMarco's attorney's "assessment of the facts of this case as they apply to an analysis under the *Asermely* case or under R.I.G.L. Section 27–7–2.2."[17] The retained attorney wrote that he did not believe that Travelers was liable in excess of the policy limits; and he stated that, in view of Mr. DeMarco's demands, there would be no resolution other than proceeding to trial. He concluded his letter by stating: "Perhaps you should study *Asermely* a bit more closely."[18]

16. In his letter of July 13, 2006 to the retained attorney, Mr. DeMarco's attorney also wrote that he believed that Travelers' July 11 offer of the policy limits to the three claimants "appears to be a thinly veiled attempt by Travelers * * * to avoid exposure above and beyond policy limits." The letter also states in pertinent part as follows:

"We forwarded the appropriate notice under the [*Asermely*] case to you and Travelers years ago. In fact we made written demands within the policy limits on February 2, 2004; February 25, 2004 and July 22, 2005, copies of which are attached for your review. At no time did we ever receive a response. * * * Leo Doire and Virginia Transportation have considerable assets and are clearly exposed to an adverse judgment solely because of Travelers refusal to discuss settlement until now.

"Given the amount of time and effort that has been invested to pursue this matter through trial, our client is now steadfast in his decision that we will move forward with a trial of this matter. It is unfortunate that Traveler's [*sic*] has failed to recognize the seriousness of this claim until some 60 days prior to trial."

17. *See* footnote 46, *infra* (quoting G.L.1956 § 27–7–2.2 in its entirety).

18. The July 31, 2006 letter to plaintiff's attorney from Travelers' retained attorney reads in pertinent part as follows:

"To this day, you and your predecessors have placed both Virginia Transportation/Leo Doire and Travelers Insurance Company in an impossible situation simply because you demand that the entire policy limit of One Million Dollars be paid to your client. Your protestation that Travelers is liable in excess of the policy limits simply ignores the facts of this case. Neither Leo Doire of Virginia Transportation or Travelers have yet to be informed by you just how much money you are willing to accept in complete satisfaction of this claim. To this day, neither Travelers nor Virginia Transportation has been able to have any discussion with, or to receive any communication from, you that would allow Travelers to pay

Then, on August 15, 2006, a little over a month before plaintiff's personal injury trial was to begin, Travelers commenced an interpleader action in the Superior Court for Providence County; Travelers simultaneously filed a motion requesting that it be allowed to deposit the policy limits into the registry of the court.

On August 23, 2006, plaintiff's attorney responded to the July 31 letter from Travelers' retained attorney and offered one final time to settle with Travelers for the policy limits. He again noted that the DeMarco personal injury trial was scheduled to begin on September 18, 2006, and he stated that "there is a very real possibility of this case exceeding [the policy] limit." He continued as follows: "If the verdict does exceed that limit, we will do everything in our power to secure that judgment, including securing the judgment through the assets of Virginia Transportation." He stated that it was his position that *Asermely* would be applicable to the instant case, thereby strongly suggesting that Travelers could be liable to an extent beyond the policy limits. He further stated that Travelers had never offered the policy limits to Mr. DeMarco. The letter from plaintiff's attorney concluded as follows:

"[I]t would appear to be in your insured's [*sic* ] best interest for you to reconsider your position as it relates to our past demands of February 2, 2004; February 25, 2004[;] and February 7, 2005. To that end, we, once again, consistent with *Asermely,* are demanding the One Million Dollars policy limit from Travelers Indemnity Company to fully resolve this matter as it relates to both your clients."

The plaintiff's attorney stated that, in view of the fact that trial was scheduled to begin in less than a month, Travelers would have until August 30 to respond to his August 23 letter; he stated that, if there was no response, he would consider the demand rejected. He added that his clients would not discuss settlement after that August 30 date.

On August 30, 2006, Travelers' claim services director wrote to plaintiff's attorney, noting that she was responding to the attorney's August 23 letter to Travelers' retained attorney. The claim services director stated: "As we have previously informed you, as a result of the duty owed to our insureds, we cannot pay the entire policy limit to your clients." She noted that, if Travelers were to pay the policy limits to Mr. DeMarco, it would thereby expose its insureds "to personal liability to satisfy the claims" of Mr. Woscyna and National Grid. The claim services director further disagreed with the contention of plaintiff's attorney that Travelers had not offered its policy limits to Mr. DeMarco. She rather tersely stated:

"We have. Those funds are available to all claimants. Unfortunately, the claimants' claims greatly exceed the available limits, thereby precluding our ability to pay full policy limits to any single claimant."

The claim services director also asserted that Travelers had responded to the past demands of Mr. DeMarco's counsel dated February 2 and February 25, 2004, and she stated that those responses "were the only responses we could have provided under the circumstances." She further ex-

its policy limits and *not* expose Mr. Doire's and Virginia Transportation's assets.

"Given the situation that you have created, we see absolutely no other resolution but that we must try this case. I, therefore,

am also moving forward in preparation for trial.

"* * *

"Perhaps you should study *Asermely* a bit more closely."

pressed her view that the letter of February 7, 2005 "[did] not constitute a demand" because it indicated that Mr. DeMarco had not completed treatment for his injuries. She informed plaintiff's attorney that, in order to resolve "this dilemma," Travelers (1) had "filed an interpleader action and [a] motion to deposit the entire policy proceeds of $1 million into the registry of the Superior Court" and (2) had proposed mediation in order to arrive at a satisfactory division of the proceeds among all claimants.

The plaintiff's attorney objected to Travelers' motion seeking leave to deposit the policy proceeds into the registry of the Superior Court, and a hearing on the motion was held on September 5, 2006. At that hearing, Travelers proposed that the court issue an order indicating that no party would be allowed to withdraw policy funds until a hearing or trial took place to determine the proper division of the funds—or until the parties themselves reached an agreement as to the division of the funds and released Travelers and its insureds from liability. Mr. DeMarco's attorney argued that the motion should be denied due to the fact that the personal injury trial against Travelers' insureds was scheduled to begin in less than two weeks. Mr. DeMarco's attorney explicitly indicated that he wanted to be able to pursue an *Asermely* claim if the trial resulted in a judgment in excess of the policy limits. The hearing justice ruled that interpleader was not warranted at that time because Travelers had "a considerable interest in the outcome" of the underlying personal injury litigation; and he denied Travelers' motion seeking leave to deposit the policy proceeds into the registry of the court.

On the same day (September 5, 2006), Travelers' claim services director wrote to the attorneys representing Mr. DeMarco, Mr. Woscyna, and National Grid, confirming that they had agreed to participate in a mediation on September 7, 2006 "in an effort to obtain a full release of all claims within the available limits." She stated that, if Travelers were not able to resolve all claims within the policy limits, it would proceed to settle claims individually and "maximize the release of the insured[s] from as much potential liability as possible."

The parties engaged in mediation on September 7, 2006, but it was unsuccessful. Then, on September 14, 2006, four days before the trial in plaintiff's case against Travelers' insureds was set to begin, Travelers' claim services director wrote to the parties offering to pay $550,000 to Mr. DeMarco and $450,000 to Mr. Woscyna, "in exchange for a complete release from both claimants" in favor of Virginia Transportation and Mr. Doire. She stated that the offer was "contingent upon acceptance by both [Mr.] DeMarco and [Mr.] Woscyna." The claim services director concluded her letter by stating that, if both parties were not prepared to accept the proposal and release all claims, Travelers would "continue with the pending Interpleader Action to let the [c]ourt determine how the liability insurance proceeds are to be distributed;" she added that Travelers would be open to an alternative proposal from the claimants that might resolve all claims within the policy limits.

Although Mr. Woscyna was prepared to accept the September 14 offer, Mr. DeMarco was not inclined to do so. In a letter dated September 15, 2006, Mr. DeMarco's attorney wrote to Travelers' claim services director to inform her that he and his client would not be accepting the settlement offer. He stated that the September 14, 2006 letter from Travelers was "the first time in 3 years that Travelers has made a formal offer to achieve a settle-

ment," and he added that "we view this as another eleventh hour attempt by Travelers to avoid responsibility above and beyond your policy limits." The letter from Mr. DeMarco's attorney concluded as follows:

> "Because no formal offer was ever made prior to September 14, 2006, we have and continue to invest considerable time, money and legal resources in preparing for the upcoming trial beginning Monday, September 18th. We are not now in a position to accept $550,000 to settle this case and focus all of our effort on the upcoming trial."

## B

### Personal Injury Trial and Subsequent Events

The jury trial in the DeMarco personal injury action against Virginia Transportation and Mr. Doire began on September 18, 2006. On the first morning of trial, Travelers again offered to pay Mr. DeMarco $550,000, and it indicated that Mr. Doire would be willing to contribute an additional $150,000 from his personal funds—thereby causing the total settlement offer to plaintiff to be in the amount of $700,000. Mr. DeMarco rejected that offer, and the trial commenced.[19]

At trial, Travelers stipulated as to liability, and it did not present any witnesses with respect to damages. On September 22, 2006, the jury returned a verdict in favor of Mr. DeMarco in the amount of $2,053,795; when interest was computed, the total judgment was in the amount of $2,801,939.07. The trial justice also taxed costs in plaintiff's favor in the amount of $5,879.32.

On the same day, September 22, 2006, an attorney retained independently by Mr. Doire wrote to Travelers' claim services director stating that it was Mr. Doire's position that Travelers was responsible for the judgment entered against him. The attorney stated that it was undisputed that Mr. DeMarco had made demands to settle within the policy limits on February 2 and February 25, 2004, on February 7, 2005, and on August 23, 2006, and that "no offer or meaningful response from Travelers occurred within a reasonable time * * *." In his September 22 letter, the attorney retained by Mr. Doire further stated:

> "It is important to emphasize that *no monetary offer to Plaintiffs DeMarco ever occurred until September 14, 2006.* At every stage of these proceedings, Mr. Doire has expressed the desire that

---

**19.** In an affidavit submitted to the Superior Court in the case at bar, Mr. Doire stated that, on several occasions during the course of the trial, he personally demanded that Travelers pay the entire policy limits to Mr. DeMarco in settlement of his claim. Mr. Doire further stated in the affidavit that he was fully aware that, if the policy limits were paid to Mr. DeMarco, he would be personally responsible for the other claims against him; he averred that he told the retained attorney and Travelers' claim services director at a meeting during the trial that he would "take the Woscyna claim on the chin."

In deposition testimony, however, the retained attorney disputed the statements made by Mr. Doire regarding his requests to Travel-

ers during the course of the trial. The retained attorney stated that, after Mr. Doire offered to contribute $150,000 from his personal funds to a settlement with Mr. DeMarco on the first morning of trial, Mr. Doire "never, ever authorized settlement again or requested settlement again." The retained attorney stated that Mr. Doire never told him that he would "take the Woscyna claim on the chin," nor did he demand that Travelers pay the policy limits to Mr. DeMarco. In addition, the retained attorney testified as follows at his deposition: "Mr. Doire knew full well that that million dollars[ ] would have been paid to Mr. DeMarco and Mr. DeMarco only if he could—if he would consent to it. He knew that."

Travelers settle this case—yet no offer was made." (Emphasis in original.)

Mr. Doire's attorney then asserted that Travelers was responsible for payment of the judgment "pursuant to *Asermely*" because Travelers had declined to settle within the policy limits; he added that Travelers also "should bear the legal expense" that Mr. Doire incurred in having to retain independent counsel due to the threat of an excess judgment. The attorney asserted that "Travelers' failure to make any offer to settle has cost Mr. Doire thousands of dollars already," and he concluded by stating that his client would explore all legal options to protect his rights and interests.

Soon thereafter, on September 29, 2006, Mr. DeMarco's attorney also wrote a letter to Travelers' claim services director, in which he stated:

"Many times prior to trial we advised both you and your counsel that this case had a very real potential for a verdict above and beyond your policy limits and we repeatedly, throughout the years since the accident, demanded the policy limits to settle Mr. DeMarco's claim. Prior to this verdict, we advised you on no less than 4 occasions that Mr. DeMarco would be willing to settle this matter for the $1,000,000 policy limit. This was presented to you in writing on February 2, 2004; February 25, 2004; July 22, 2005 and finally on August 23, 2006. The only response we ever received was on February 27, 2004 when [the claim services director] asserted that Travelers could make no offer to our client because there were multiple claimants.

" * * * The only settlement offer ever made in this matter came the Friday before trial. * * * Incredibly, on the day of trial, a second offer to settle the case was extended in the amount of $700,000, with the clear understanding that your insured was contributing some of his own personal money.

"To date, no other offer has been made. In the middle of the trial, your own insured demanded that the matter be settled within the policy limits and even then you ignored his wishes. The consistent position of Travelers has been that it is not capable of settling this case, or even attempting to settle, because another claim exists."

Mr. DeMarco's attorney then stated that it was "now clear" that Travelers had not entertained the settlement demands because the company "appears to have a company policy of delaying potential settlements based on the premise that there are multiple claimants." He asserted that there was "no reasonable basis" for Travelers to act as it had regarding Mr. DeMarco's demands, and he stated that "Travelers did so to comply with a company policy that clearly infringes on the fiduciary duty [that] it owes to its insureds."

The attorney further noted in his letter that Virginia Transportation was "on the brink of financial ruin as a direct result of the significant judgment against it and because of Travelers' steadfast refusal to make an offer to only one claimant;" he added that it was his understanding that "all lines of credit, bank accounts and future financing" for the company had been halted. The attorney concluded by stating that he believed that the facts he had outlined "could likely result in one of the largest bad faith claims in the United States" in years; but he also stated that Mr. DeMarco was nonetheless willing to accept the amount of the judgment in full and final satisfaction of his claim, and he added that this offer would remain open only until October 18, 2006.

Approximately one month later, on October 30, 2006, a new and different attor-

ney[20] wrote to Mr. DeMarco's attorney stating that he had been retained by Travelers to respond to the attorney's September 29, 2006 letter to Travelers' claim services director. He stated that the contention that Travelers' conduct infringed on the fiduciary duty it owed to its insureds was "legally and factually unfounded." Citing this Court's opinion in *Asermely*, he acknowledged that Travelers had a duty to act in the best interests of its insureds to protect them from excess liability, and he asserted that, "[m]indful of this duty, from the time it was first notified of the potential claims against its insureds, Travelers sought to settle the claims in a manner that would protect its insured[s] from excess liability." He stated that the February 7, 2005 letter from plaintiff's attorney to the retained attorney requesting that Mr. Woscyna's claim not be settled until Mr. DeMarco's medical treatment had ended and his claim was ready to be resolved was an "explicit recognition that Travelers could not independently settle with one of the claimants without exposing [its insureds] to excess liability" and was an acknowledgement that it would have been "premature" for Travelers to have "consider[ed] any settlement" at that time.

Addressing the contention of plaintiff's attorney that Travelers had a company policy of delaying settlement in multiple claimant situations, the second retained attorney stated that there was no factual basis for such an assertion, and he added that plaintiff's attorney's own letter of February 7, 2005 suggested that Travelers should wait to settle the claims against its insureds at one and the same time. The second retained attorney indicated that the reason that Travelers had refused to pay the policy limits to Mr. DeMarco, even though doing so would (in the attorney's view) have advanced Travelers' own financial interests, was because it would have left its insureds unprotected against Mr. Woscyna's claim. He stated that Travelers had refused any demand where it "could even remotely be construed" that Travelers was putting its own interests ahead of those of its insureds, stating that "*Asermely* is the guiding law by which Travelers has made its decisions, and by which it will continue to make its decisions." The attorney concluded the letter by requesting that plaintiff's attorney agree to stay the entry of final judgment in the personal injury action so that the parties could again attempt to resolve the matter through mediation, noting that this would be in Mr. DeMarco's interest since any potential for Virginia Transportation and Mr. Doire to contribute to a settlement pool would likely be extinguished if they were forced into bankruptcy.[21]

Then, on November 7, 2006, corporate counsel for Virginia Transportation wrote a letter addressed to both of the attorneys retained by Travelers. He stated that the verdict in the personal injury case had "already caused great harm" to the insureds whom he represented. He further stated that the insureds were willing to

20. We shall hereinafter refer to the "new and different attorney" who is referenced in the text as "the second retained attorney" in order to distinguish him from the attorney whom throughout this opinion we have described and shall continue to describe as "the retained attorney."

21. In his brief to this Court, plaintiff states that the trial justice in the personal injury action granted a thirty day stay of entry of the judgment at the request of counsel for the insureds, but he asserts that it later became evident that the Superior Court clerk had already entered a judgment on the jury verdict, pursuant to Rule 58 of the Superior Court Rules of Civil Procedure, on September 22, 2006, the day when the verdict was rendered.

attend mediation if it could be expected to be productive, but he added that any discussion had to take place within the next ten days because, after such time, the insureds would face "substantial and irreparable harm" and would be forced to file for relief under Chapter 11 of the United States Bankruptcy Code. Virginia Transportation's corporate counsel then noted that Virginia Transportation's lenders had already "significantly reduced" the company's operating line of credit and had given notice that the judgment in the personal injury case was "a material event of default." He emphasized (1) that the lenders were demanding an immediate resolution of all claims against Virginia Transportation and (2) that, if the lenders withdrew their financial support, the company would be forced to immediately cease operation and face the loss of "several million dollars in annual revenue." Virginia Transportation's corporate counsel asserted that Travelers had had several opportunities to settle with Mr. DeMarco and Mr. Woscyna within policy limits but had failed or refused to do so "without regard to the consequences" for its insureds; he also asserted that Travelers had "ignored the clear and unequivocal instruction of your insured at trial to offer the policy limit to the DeMarco claimants." He further wrote that the insureds were presently faced with substantial excess liability due to the result of the DeMarco personal injury trial as well as with a possible adverse verdict in the yet-to-be-held trial of the Woscyna claim.

Virginia Transportation's corporate counsel next stated that, although the insureds' preference would be to defend against the Woscyna claim, they could not take that risk because of the damage that they had already sustained as a result of the verdict in the DeMarco action. He stated that counsel for Mr. Woscyna had offered to settle his client's claims against

the insureds for $500,000, and he directed Travelers to immediately pay that amount to Mr. Woscyna "under the existing policy." He also urged Travelers to accept responsibility for the entire DeMarco judgment, including the amounts in excess of the policy limits and interest, because of what he characterized as the insurer's "mishandling" of the claim. He informed the attorneys for Travelers that "the DeMarco claimants appear willing to release your insured from the judgment in consideration of an assignment of the claims of your insured against Travelers;" and he stated that, unless Travelers was willing to accept responsibility for the entire judgment, the insureds "may have no * * * means of avoiding the need for chapter 11 protection [other than by] the assignment of those claims." He concluded by stating that the insureds would have no choice but to resume discussions with Mr. DeMarco about the assignment of their claims against Travelers if they did not receive a response by November 10, 2006.

Also on November 7, 2006, Travelers brought a declaratory judgment action in the United States District Court for the District of Rhode Island, naming Virginia Transportation, Mr. Doire, Mr. DeMarco, Mr. Woscyna, and National Grid as defendants. Travelers requested a judgment declaring: (1) that Travelers' duty to defend or settle claims against its insureds would end when it exhausted the $1 million policy limits; (2) that Travelers was entitled to exhaust the policy limits by paying $1 million to Mr. DeMarco in partial payment of the judgment against Travelers' insureds; (3) that Travelers had not been required to pay the policy limits to Mr. DeMarco prior to entry of the judgment in the personal injury case; (4) that Travelers was not required to make any payment to Mr. Woscyna or National Grid (absent a judgment favorable to them) where such

payment would reduce sums available to pay Mr. DeMarco's judgment; (5) that Travelers was not required to pay any interest that had accrued after the entry of the judgment in the personal injury case; (6) that Travelers was not required to make any payment to Mr. DeMarco, Mr. Woscyna, or National Grid in excess of the policy limits; and (7) that Travelers was not required to indemnify or pay its insureds for any amount in excess of the policy limits.

Shortly thereafter, on November 17, 2006, Travelers arranged for a mediation to be conducted involving counsel for Virginia Transportation, Mr. Doire, Mr. De-Marco, and Mr. Woscyna respectively. In the wake of that mediation, Travelers offered to pay the sum of $450,000 to Mr. Woscyna; he accepted that offer and proceeded to release Virginia Transportation, Mr. Doire, **and Travelers** from liability that same day. The Woscyna release document was entitled *"RELEASE AND SETTLEMENT OF CLAIM;"* it provides in pertinent part as follows:

> *"**For the Sole Consideration** of Four Hundred Fifty Thousand and 00/100 ($450,000.00) Dollars, in hand paid, * * * the receipt of which is hereby acknowledged, we PAUL D. WOSCYNA, DOROTHY M. WOSCYNA * * *, and KRISTEN R. WOSCYNA, a minor (collectively, the "Releasors"), do hereby release and forever discharge LEO H. DOIRE, VIRGINIA TRANSPORTATION CORP., a Rhode Island corporation, and TRAVELERS INDEMNITY COMPANY OF AMERICA (collectively,*

the "Releasees"), and all other persons, firms or corporations from any and all claims * * * resulting or to result from an accident that occurred on or about September 10, 2003, in Cranston, Rhode Island and as claimed in a civil action entitled *Paul D. Woscyna, et al v. Leo H. Doire, Jr. and Virginia Transportation Corporation* * * *.

> *"**It is expressly understood and agreed that** the acceptance of the said above amount is in full accord and satisfaction of a disputed claim * * *."* (Emphasis in original.)

Further in the wake of the November 17, 2006 mediation, Travelers also agreed to pay $550,000 to plaintiff DeMarco. Mr. DeMarco accepted that amount and proceeded to release Virginia Transportation and Mr. Doire from liability. *However, taking a significantly different tack from the one taken by Mr. Woscyna, Mr. De-Marco explicitly declined to release Travelers in the release document that he signed. That document states in pellucid language that Mr. DeMarco specifically reserved any and all claims against Travelers.*[22] The release document was entitled *"GENERAL RELEASE;"* it provides in pertinent part as follows:

> "KNOW ALL MEN, THAT WE, WAYNE DEMARCO, LEESA DE-MARCO, BRAEDYN DEMARCO and CHAYCE DEMARCO (collectively, the "Releasors"), in consideration of the sum of $550,000.00 (**Five Hundred Fifty Thousand 00/100) Dollars** to be paid by Travelers Insurance Company of America, and for other good and valuable

---

22. In his brief to this Court, plaintiff characterizes Travelers' payment to him of $550,000 as a "gratuitous payment" of the amount remaining in the policy after the $450,000 payment to Mr. Woscyna was deducted. The plaintiff emphasizes that, in contrast to Mr. Woscyna, he accepted payment without releasing Travelers from liability, and he alleges that Travelers "had no involvement whatsoever in procuring" the release of its insureds with respect to his claim. In contrast, Travelers asserts in its brief that it "obtained releases of Doire and Virginia Transportation from the two claimants in exchange for its payment of the policy limit."

consideration, the receipt and adequacy of which is hereby acknowledged, do hereby remise, release, and forever quitclaim unto said LEO H. DOIRE and VIRGINIA TRANSPORTATION CORP., a Rhode Island corporation, their successors and assigns (collectively, the "Releasees"), any and all manners of action * * * which against said Releasees said Releasors ever had, now have, or in the future may have * * * including, without limitation, any and all loss, damage or claim arising out of the subject matter of the litigation brought by the Releasors against Releasees in the Providence County Superior Court being Civil Action No. 04–1171 (the "Litigation"), and any verdict or judgment entered in the Litigation.

"This General Release shall not in any way be construed, nor is it intended, to release Travelers Insurance Company of America * * * from any and all claims that Releasors may have against Travelers in any way arising from the Litigation or any aspect thereof. The same are specifically reserved by Releasors." (Emphasis in original.) [23]

On the same day as the two just-referenced release documents were executed (November 17, 2006), Mr. DeMarco also entered into an agreement with Virginia Transportation and Mr. Doire,[24] in which they assigned to him "any and all claims and causes of action that [they] may have" against Travelers.[25] The assignment document explicitly recites that the assignment of claims was effected *"in consideration of the General Release executed contemporaneously herewith * * *."* [26] (Emphasis added.)

The claims that were assigned to plaintiff include claims (1) that "in any way related to the conduct of Travelers in the handling of the claims of the Assignees" subsequent to the motor vehicle collision and resulting in the personal injury litigation or (2) that related to "the manner in which Travelers and appointed counsel discharged their respective obligations to Doire and Virginia, including but not limited to all claims for fraud, breach of contract, breach of all duties of good faith and fair dealing, bad faith, further including but not limited to any and all *Asermely* claims * * *." The assignment document also provided that Virginia Transportation

---

23. A copy of the entire DeMarco release document is appended to this opinion as "Appendix A."

24. Virginia Transportation's corporate counsel (and not either of the attorneys retained by Travelers) represented Virginia Transportation and Mr. Doire in connection with their assignment of claims to Mr. DeMarco.

In an affidavit submitted to the Superior Court in this case, Mr. Doire stated that November 17, 2006 was the last business day before he was to file a bankruptcy petition; he added that on that day he "individually and on behalf of Virginia [Transportation], assigned all of our rights to [Mr.] DeMarco in exchange for a release running in favor of only Virginia [Transportation] and me." Mr. Doire also stated in the affidavit that, "[b]y virtue of the assignment of all of my rights and the rights of Virginia [Transportation] to

[Mr.] DeMarco, Virginia [Transportation] was able to resolve the claims as demanded by its creditors and avoid bankruptcy."

25. A copy of the entire assignment document is appended to this opinion as "Appendix B." In addition to what it sets forth with respect to possible claims against Travelers, the assignment document also indicates that Virginia Transportation and Mr. Doire have assigned to plaintiff any and all claims and causes of action that they may have against the retained attorney and his law firm.

26. It will be seen that the fact that the referenced documents were executed contemporaneously is of considerable significance to our reasoning as to the legal and practical effect of those documents.

and Mr. Doire agreed "to cooperate fully in good faith as a material part of this Assignment" with Mr. DeMarco and his attorney in their exercise of the assigned rights and "any rights against parties not released."

Subsequent to the payment of the $450,000 and $550,000 amounts and the signing of the releases by Mr. DeMarco and Mr. Woscyna, Travelers filed an amended complaint in the then-pending federal district court declaratory judgment action, attaching copies of both the De-Marco and Woscyna releases and also attaching a stipulation signed by counsel for National Grid and by corporate counsel for Virginia Transportation, which stipulation indicates that National Grid's claims against Virginia Transportation and Mr. Doire have been dismissed. Travelers alleged in the amended federal court complaint that it had exhausted the policy limits in paying $1 million to settle the claims of Mr. DeMarco and Mr. Woscyna, and it requested that the federal court enter the following judicial declarations: (1) that Travelers had satisfied its contractual duties to its insureds; (2) that Travelers had not been required to pay the entire policy limits to Mr. DeMarco where doing so would have left Virginia Transportation and Mr. Doire uninsured against other claims; (3) that Travelers was not required to pay any sums in excess of the policy limits; and (4) that Travelers was not required to indemnify or pay its insureds any sums that they might have agreed to pay Mr. DeMarco in connection with an assignment.

## C

## Initiation of the Instant Action and Motions for Summary Judgment

On November 22, 2006, shortly after receiving the assignment of claims from Virginia Transportation and Mr. Doire, Mr. DeMarco commenced the instant civil action in the Superior Court for Providence County naming as defendants Travelers and the retained attorney and his law firm. The complaint contained the following six counts: count one, demanding a declaratory judgment pursuant to *Asermely* ordering Travelers to pay "the entire verdict/judgment amount" from the personal injury litigation above and beyond the $1 million policy limits, plus all accrued interest, and reasonable attorneys' fees and costs; count two, demanding a declaratory judgment pursuant to G.L.1956 § 27–7–2.2 requiring Travelers to pay interest on the entire amount;[27] count three, alleging breach of contract; count four, alleging bad faith and breach of fiduciary duty pursuant to G.L.1956 § 9–1–33; count five, alleging that Travelers is liable to Mr. DeMarco "separate and apart from [his] legal status" as an assignee of Virginia Transportation; and count six, alleging legal malpractice by the attorney and firm retained by Travelers to represent Virginia Transportation in the personal injury litigation.[28]

On January 3, 2007, the trial justice who had presided over the personal injury liti-

**27.** It is the Superior Court's rulings with respect to count one and count two that are the subject of the instant appeal.

**28.** On December 12, 2006, Travelers filed a notice of removal in the United States District Court for the District of Rhode Island, removing Mr. DeMarco's November 22 action against Travelers from the Superior Court on the basis of diversity jurisdiction. Mr. De-Marco reacted by moving to remand the case to the Superior Court, alleging that the appointed attorney and his law firm were non-diverse parties. On January 31, 2007, the federal court issued a two-page order granting the motion to remand.

gation brought by Mr. DeMarco against Virginia Transportation and Mr. Doire entered an order stating that the judgment entered in that litigation was "satisfied in full."[29]

On August 2, 2007, plaintiff filed in the Superior Court a motion for summary judgment with respect to counts one and two of his six-count complaint, specifically requesting entry of final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure as to those two counts. Travelers objected to plaintiff's motion for summary judgment, and it filed a cross-motion for summary judgment with respect to all counts.

In the memorandum submitted to the Superior Court in support of his motion for partial summary judgment, plaintiff, relying on the assignment of rights which he had received from Travelers' insureds, argued that, pursuant to the rule established in *Asermely*, Travelers was obliged as a matter of law to pay him the entire amount of the judgment entered against its insureds as a result of the personal injury trial. The plaintiff contended that Travelers had such an obligation because it had "declined to settle the DeMarco claim within the [p]olicy [l]imit" prior to or during trial, and therefore had, in the words of the *Asermely* opinion, "assume[d] the risk of miscalculation if the ultimate judgment should exceed the policy limits." The plaintiff further contended that the *Asermely* rule applied in cases such as his, in which there were multiple claimants for

policy proceeds, notwithstanding the fact that the actual *Asermely* case involved a single claimant. He also contended that his claims against Travelers pursuant to *Asermely* had not been extinguished when he executed a release of the insureds from liability. Finally, plaintiff argued that, pursuant to § 27-7-2.2 (the "rejected settlement offer statute"), Travelers was required to pay all interest due on the judgment in the personal injury action—both prejudgment and postjudgment interest.[30]

In its opposition to plaintiff's motion for summary judgment, defendant Travelers argued that neither the *Asermely* rule nor § 27-7-2.2 applies in cases in which there are multiple claimants for the policy proceeds. The insurance company also argued that plaintiff could not establish a required element of his claim—*viz.*, that Travelers had breached its duty under *Asermely* to its insureds; it contended that, because Mr. DeMarco and Mr. Woscyna had released the insureds from all liability, the insureds had suffered no harm that could be the basis for an assignment of rights against Travelers to Mr. DeMarco.

A hearing on the respective motions was held on October 16, 2007; and, on September 23, 2008, the hearing justice issued a twenty-three page written decision granting plaintiff's motion for summary judgment on counts one and two and denying defendant's cross-motion in its entirety.[31]

---

**29.** The January 3, 2007 order signed by the justice of the Superior Court who had presided over the personal injury trial reads in pertinent part as follows:

"After hearing thereon and in consideration thereof judgment entered in favor of the plaintiffs on September 22, 2006, plus taxed costs in the amount of $5,879.32. Said judgment is satisfied in full."

In their submissions to this Court, both parties refer to that order as "the judgment satisfied order."

**30.** *See* footnote 46, *infra.*

**31.** It should be noted that the justice of the Superior Court who presided over the summary judgment hearing in 2008 was not the justice who had presided over the personal injury jury trial in 2006.

With respect to count one, the hearing justice agreed with plaintiff that, although the *Asermely* case involved only a single claimant for the policy proceeds, the principle elaborated upon by this Court in that case was also applicable in multiple claimant cases. Citing with approval the opinion of the United States Court of Appeals for the First Circuit in the case of *Peckham v. Continental Casualty Insurance Co.*, 895 F.2d 830, 835 (1st Cir.1990) (Selya, J.),[32] the hearing justice in the instant case stated that an insurer faced with a multiple claimant situation (1) "should take affirmative steps to relieve its insured of so much of his or her potential liability as is reasonably possible" in light of the surrounding circumstances and (2), in accordance with *Asermely*, "must seriously consider the claimants' reasonable offers to settle within the policy limits or assume the consequences of its failure to do so." In addressing the settlement issue with respect to particular claims, the hearing justice further stated that an insurer would be called upon to consider which of the claims presented the greatest threat or threats to its insureds. She also stated that an insurer's ultimate liability under *Asermely* would depend on the quality of the insurer's exercise of its professional skills in making such a "judgment call" with respect to the settlement of claims. She recognized that there could be "instances where the insurer determines [that] its insured's interests are best served by expending the policy limits on a single claim."[33] However, with respect to the instant case, the hearing justice determined that "legal analysis and fact questions relevant to an insurer's obligations in multi-claimant cases [were] beside the point." She explained that determination as follows:

> "It is undisputed that Travelers did not attempt to negotiate *any* of the claims until days before the DeMarco trial was locked on to begin and, instead, refused to consider all of the three claimants' settlement offers, relying on the claimants to negotiate their claims vis-à-vis each other and reach a global settlement within the policy limits. Furthermore, Travelers refused to make any unconditional individual settlements until *after* the DeMarco claim had been reduced to a judgment, and the insureds' liability on it and the accumulated interest had attached. It was only then that Travelers settled one of the claims and, therefore, questions concerning its use of professional skill and good faith in selecting which of the multiple claims should be settled in order to 'relieve its insured of so much of his [or her] potential liability as is reasonably possible' are extraneous in the context of the narrow circumstances of this case." (Emphasis in original.)[34]

The hearing justice also rejected Travelers' contention that it was not liable to Mr.

**32.** Although the case of *Peckham v. Continental Casualty Insurance Co.*, 895 F.2d 830 (1st Cir.1990), required the First Circuit to analyze and apply principles of Massachusetts insurance law concerning multiple claimant cases, we are in full agreement with the hearing justice that the First Circuit's articulation of basic principles in that case is applicable to the case at bar.

**33.** In support of the observation quoted in the text, the hearing justice cited the First Circuit's opinion in *Peckham*, 895 F.2d at 835, as well as the opinion of the United States Court of Appeals for the Fifth Circuit in the case of *Liberty Mutual Insurance Co. v. Davis*, 412 F.2d 475, 481 (5th Cir.1969). The hearing justice also cited a respected treatise dealing with insurance law, *viz.*, 22 Eric Mills Holmes, *Holmes' Appleman on Insurance 2d* § 137.2 at 127 (2003).

**34.** The quoted language within the block quote in the text is from the First Circuit's opinion in *Peckham*, 895 F.2d at 835.

DeMarco due to the fact that Mr. DeMarco had released its insureds from liability; in so ruling, the hearing justice pointed to the fact that the language of the release executed by Mr. DeMarco specifically excluded Travelers from its reach. (*See* text accompanying footnote 23, *supra.*)

The hearing justice accordingly concluded that granting summary judgment in plaintiff's favor with respect to count one would be appropriate under *Asermely* because Travelers had not submitted admissible evidence showing any of the following: (a) that plaintiff's offer to settle for $1 million was not reasonable; (b) that Travelers had not had adequate time to investigate, consider, and respond to the offer; (c) that plaintiff's August 30, 2006 deadline for accepting his final offer was unreasonable; (d) that Travelers ever offered to settle with plaintiff for the policy limits; or (e) that Travelers could not accept the offer because the policy limits were depleted or exhausted.

With respect to count two, the hearing justice also granted summary judgment in plaintiff's favor, stating that the terms of § 27–7–2.2 (the "rejected settlement offer statute;" *see* footnote 46, *infra*) were "clear and unambiguous" in providing that an insurer is liable for all interest due on a judgment where it has rejected a plaintiff's written offer to settle within or at the policy limits. Accordingly, the hearing justice held that Travelers would be liable under § 27–7–2.2 for both prejudgment and postjudgment interest on the judgment in the personal injury case.

The hearing justice then went on to deny Travelers' cross-motion for summary judgment on the remaining counts. She stated that, "[a]lthough Travelers' failure to settle any of the claims until after the DeMarco jury returned its verdict is un-disputed, there exist genuine issues of material fact about the nature and extent of the harm that Doire and Virginia suffered as a result of the excess judgment."

Subsequently, on October 20, 2008, the hearing justice, citing Rule 54(b), ordered that final judgment should enter in plaintiff's favor with respect to counts one and two. Travelers filed a timely notice of appeal.

On appeal, defendant Travelers contends that the hearing justice committed reversible error in granting summary judgment in plaintiff's favor on counts one and two because, in Travelers' view, plaintiff's release of Virginia Transportation and Mr. Doire, as well as the trial court's eventual judgment satisfied order,[35] extinguished any claim against Travelers that might otherwise have been assigned to plaintiff by the insureds. Further, Travelers argues that the rule in *Asermely* does not apply in multiple claimant cases; it also contends that the record contains facts on the basis of which a finder of fact could conclude that the insurer acted reasonably and in its insureds' best interests in handling plaintiff's claim. Finally, Travelers argues that affirming the decision below would have a negative impact in terms of public policy by, in effect, compelling insurers to subordinate the interests of policyholders to those of third-party claimants.

## II

### Standard of Review

It is a basic principle that "[s]ummary judgment is a drastic remedy, and a motion for summary judgment should be dealt with cautiously." *Estate of Giuliano v. Giuliano,* 949 A.2d 386, 390 (R.I.2008) (internal quotation marks omitted); *see also Plainfield Pike Gas & Convenience, LLC v. 1889 Plainfield Pike Realty Corp.,*

---

**35.** *See* footnote 29, *supra,* and accompanying text.

994 A.2d 54, 57 (R.I.2010). In a similar vein, we have indicated that "[a] hearing justice who passes on a motion for summary judgment must review the pleadings, affidavits, admissions, answers to interrogatories, and other appropriate evidence from a perspective most favorable to the party opposing the motion." *Estate of Giuliano*, 949 A.2d at 391 (internal quotation marks omitted).

By the same token, however, the party who opposes a summary judgment motion "bears the burden of proving, by competent evidence, the existence of facts in dispute," *Cullen v. Lincoln Town Council*, 960 A.2d 246, 248 (R.I.2008); and that party "cannot rest upon mere allegations or denials present in the pleadings, mere conclusions, or legal opinions." *Industrial National Bank of Rhode Island v. Patriarca*, 502 A.2d 336, 338 (R.I.1985); *see also Air Distribution Corp. v. Airpro Mechanical Co.*, 973 A.2d 537, 540–41 (R.I. 2009).

When this Court reviews the grant of a motion for summary judgment, it does so in a *de novo* manner, and it applies the same standards and rules as did the hearing justice. *Planned Environments Management Corp. v. Robert*, 966 A.2d 117, 121 (R.I.2009); *see also Carrozza v. Voccola*, 962 A.2d 73, 76 (R.I.2009); *Estate of Giuliano*, 949 A.2d at 391. In conducting such a review, this Court must consider the "admissible evidence in the light most favorable to the nonmoving party." *Cullen*, 960 A.2d at 248 (internal quotation marks omitted).

We shall affirm the grant of summary judgment "if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Lynch v. Spirit Rent–A–Car, Inc.*, 965 A.2d 417, 424 (R.I.2009); *Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 750 (R.I.2004). At the same time, however, it

is axiomatic that, "[w]hen a genuine issue of fact exists * * * the trial justice must not decide the issue," and in such an instance summary judgment is not an appropriate remedy. *Gliottone v. Ethier*, 870 A.2d 1022, 1027 (R.I.2005); *see also Estate of Giuliano*, 949 A.2d at 391 ("It is important to bear in mind that the purpose of the summary judgment procedure is issue finding, not issue determination.") (internal quotation marks omitted).

## III

## Analysis

### A·

### Applicability of *Asermely* in the Multiple Claimant Context

We shall first address Travelers' contention on appeal that the hearing justice erred in granting summary judgment for plaintiff on count one of his complaint, which count alleged that Travelers was liable under *Asermely* for the judgment against its insureds in excess of the policy limits. Travelers argues that summary judgment should not have been granted with respect to this count for several reasons. Travelers asserts that the rule established by this Court in *Asermely* applies *only* where there is a single claimant for the policy proceeds and where that claimant offers to settle within the policy limits; Travelers contends that the *Asermely* principle does not apply in a situation (such as the case at bar presents) where there are multiple claimants whose combined claims exceed the policy limits. Travelers further contends that, with respect to the instant case, it acted reasonably and in its insureds' best interests in refusing to settle with Mr. DeMarco for the policy limits. Travelers also argues (1) that there was evidence that Mr. Doire opposed payment of the policy limits to Mr. DeMarco and (2) that such opposition

by the insured would relieve it of liability under *Asermely*.

Travelers characterizes the issue before us with respect to count one as constituting a matter of first impression for this Court; it describes the issue as being the existence *vel non* of "an insurer's liability for a tort judgment in excess of the liability insurance policy limit when there are multiple claimants and an insufficient limit to pay all claims."

Since promulgating what the *Asermely* opinion characterized as a "new rule," 728 A.2d at 464, this Court has not delved further into the ramifications of the holding in that case in the context of an insurer's decision not to settle third-party claims. Accordingly, it is now incumbent upon us to determine whether the principles set forth in *Asermely* should apply to the factual context of the case before us, in which there were multiple claimants for insurance policy proceeds and the total amount of those claims exceeded the policy limits—and, if those principles do apply at least in a general sense, whether it is necessary to modify the reach of the *Asermely* rule in any respect.

For the reasons set forth below, it is our opinion that the principles underlying this Court's opinion in *Asermely* apply to cases involving multiple claims that exceed the policy limits; but it is further our opinion that it is incumbent upon us to explicate the applicability of the *Asermely* principles in the multiple claimant context. Moreover, since certain facts in dispute need to be resolved by a fact-finder, it will be necessary for us to vacate the grant of summary judgment for plaintiff with respect to count one of his complaint and remand for further findings of fact to determine whether or not defendant met its obligations under the explicated *Asermely* standard.

## 1. Applicability of the *Asermely* Principles in the Multiple Claimant Context

■ We begin our analysis by reviewing this Court's opinion in *Asermely v. Allstate Insurance Co.*, 728 A.2d 461 (R.I.1999). That case involved a plaintiff who brought a negligence action against certain defendants with a limited amount of insurance coverage; after a jury trial, the plaintiff was awarded damages that amounted to approximately $36,000 in excess of the limits of the insureds' liability policy. *Asermely*, 728 A.2d at 462. Prior to trial, the case had been the subject of a court-annexed arbitration proceeding, at the conclusion of which the arbitrator issued an award in plaintiff's favor within the policy limits. Although the plaintiff was willing to accept that award, the insurance company rejected it and opted to proceed to trial. *Id.* After the plaintiff prevailed at trial on the negligence claim, the insureds assigned their rights to the plaintiff, who proceeded to sue the insurance company for damages.

The plaintiff's complaint in the *Asermely* case contained five counts: (1) a claim that the plaintiff was entitled to interest in excess of the policy limits pursuant to § 27-7-2.2 (the "rejected settlement offer statute"); (2) an allegation that the defendant insurance company had breached its duty to exercise good faith in the handling of the plaintiff's claim; (3) a claim that the plaintiff was entitled to damages as a result of the defendant's alleged fraudulent misrepresentation and refusal to pay the policy limits to the plaintiff for more than one and one-half years after the final judgment; (4) an allegation that the defendant breached its duty under the statutorily created tort of bad faith refusal to settle; [36]

---

**36.** General Laws 1956 § 9-1-33 provides in pertinent part as follows:

and (5) an allegation that the defendant had breached its contractual obligations. *Asermely,* 728 A.2d at 463–64.

In due course, the defendant insurance company moved for summary judgment. After a hearing on that motion, a justice of the Superior Court granted the motion for summary judgment with respect to the rejected settlement offer statutory claim, the fraudulent misrepresentation claim, and the bad faith refusal to settle claim. On the plaintiff's appeal to this Court, we affirmed the grant of summary judgment with respect to the fraudulent misrepresentation and bad faith claims (although we sustained the plaintiff's appeal as to the rejected settlement offer statutory claim). *Asermely,* 728 A.2d at 463–64. Applying the bad faith tort standard with respect to an insurer's extra-contractual liability, the Court held that the insurer had not acted in bad faith in refusing to settle because the claim against its insureds was "fairly debatable." *Id.* at 464 (internal quotation marks omitted). At the same time, however, the Court took the "opportunity to promulgate a new rule" to serve as guidance to the trial courts in deciding future cases where an insurance company's opting not to settle claims prior to trial eventuates in a judgment against its insured in excess of policy limits. *Id.* We observed that "[t]his Court has held that an insurance company has a fiduciary obligation to act in the 'best interests of its insured in order to protect the insured from excess liability * * * [and to] refrain from acts that demonstrate greater concern for the

insurer's monetary interest than the financial risk attendant to the insured's situation.'" *Id.* (quoting *Medical Malpractice Joint Underwriting Association of Rhode Island v. Rhode Island Insurers' Insolvency Fund,* 703 A.2d 1097, 1102 (R.I.1997)). The Court in *Asermely* further noted that this obligation extends not only to the insurance company's insureds, but also to parties to whom the insureds have assigned their rights. *Id.* The Court then described an insurer's obligation as follows:

> "It is not sufficient that the insurance company act in good faith. An insurance company's fiduciary obligations include a duty to consider seriously a plaintiff's reasonable offer to settle within the policy limits. Accordingly, if it has been afforded reasonable notice and if a plaintiff has made a reasonable written offer to a defendant's insurer to settle within the policy limits, the insurer is obligated to seriously consider such an offer. If the insurer declines to settle the case within the policy limits, it does so at its peril in the event that a trial results in a judgment that exceeds the policy limits, including interest." *Id.*

Under *Asermely,* even if bad faith cannot be shown, an insurer will still be exposed to potential liability for the amount of a judgment that exceeds policy limits, unless the insurer can show that the insured was unwilling to accept the plaintiff's settlement offer. *Id.* The Court in *Asermely* concluded its discussion with the following unambiguous statement: "Even if the in-

---

"**Insurer's bad faith refusal to pay a claim made under any insurance policy.**— (a) Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged the insurer wrongfully and in bad faith refused to pay or settle a claim

made pursuant to the provisions of the policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages, and reasonable attorney fees."

surer believes in good faith that it has a legitimate defense against the third party, it must assume the risk of miscalculation if the ultimate judgment should exceed the policy limits." *Id.*

In several subsequent decisions involving contexts other than the failure to settle third-party claims, this Court has explicated further the principle that was first set forth in *Asermely*. In our opinion in *Travelers Insurance Co. v. Hindle*, 748 A.2d 256 (R.I.2000), we addressed an insurer's obligations in the context of an injured plaintiff who had filed a claim for uninsured/underinsured motorist benefits from his insurer and then requested permission from that insurer to settle his personal injury suit with the defendant-tortfeasor. In that case, the insurer had argued that "court-ordered discovery" of the defendant's assets was necessary so that the insurer could meet its fiduciary obligations to consider seriously a plaintiff's reasonable offer to settle within the policy limits, as required by *Asermely* and our subsequent decision in *Bolton v. Quincy Mutual Fire Insurance Co.*, 730 A.2d 1079 (R.I. 1999).[37] *Hindle*, 748 A.2d at 259. We held in *Hindle* that, for an insurer to meet its obligations under *Asermely* and *Bolton*, it was not required that the insurer avail itself of court-ordered discovery concerning the defendant's assets. *Hindle*, 748 A.2d at 260. Rather, we construed our precedent as meaning that an insurer's duty to seriously consider a defendant's offer to settle would be satisfied by conducting a reasonable inquiry into a defendant's assets by means of private asset discovery (as contrasted with court-ordered discovery). We further observed that, although "[t]he reasonableness standard articulated in *Asermely* and its prog-

eny, *Bolton*, is necessarily flexible, and we are reluctant to give it rigid judicial shape," an insurer that performs private asset discovery "as routinely conducted by other similarly situated insurers in the industry would presumably * * * be deemed to have acted reasonably" as to that aspect of its duty. *Hindle*, 748 A.2d at 260.

In *Skaling v. Aetna Insurance Co.*, 799 A.2d 997 (R.I.2002) (*Skaling II* ), we were called upon to review the trial court's grant of summary judgment in favor of a defendant insurance company in the face of its insured's allegation of bad faith in connection with the insurer's investigation and handling of the insured's claim for underinsured motorist benefits. Citing our opinion of three years earlier in *Asermely*, we stated in *Skaling II*:

> "We have made it abundantly clear that the duty of good faith and fair dealing includes *an affirmative duty to engage in timely and meaningful settlement negotiations* and to make and consider offers of settlement consistent with an insurer's fiduciary duty to protect its insured from excess liability." *Skaling II*, 799 A.2d at 1005 (emphasis added).

We further stated in *Skaling II* that, under *Asermely*, the "risk of miscalculating the merits of a claim and proceeding to trial falls upon the insurer, the entity that controls the litigation and with whom the insured has contracted." *Id.* at 1006. Although *Skaling II* involved the first-party claim of an insured against an insurer rather than a third-party claim as was at issue in *Asermely*, we indicated that both cases implicated similar policy concerns; we emphasized that, even if a claim against an insured is fairly debatable, an insurer

---

**37.** In *Bolton v. Quincy Mutual Fire Insurance Co.*, 730 A.2d 1079, 1081 (R.I.1999), we held that an insurer's fiduciary obligation to its insured to consider seriously a plaintiff's offer

to settle within the policy limits also included a duty to determine that a tortfeasor's assets were "realistically reachable in a subrogation action."

"is nonetheless obliged to engage in settlement discussions in an effort to relieve the insured from the burden and expense of litigation." *Id.* at 1011. And we very clearly stated that "[i]t is the policy of this state to encourage the settlement of controversies in lieu of litigation." *Id.* at 1012.

We must now determine whether, as Travelers contends, the *Asermely* rule should not apply in this case where, in contrast to the single claimant at issue in *Asermely,* there was more than one claimant for the policy proceeds and the combined claims exceeded the policy limits. Travelers has argued to this Court that the rationale behind the rule in *Asermely* applies only "to cases involving a **single** injured claimant who makes a settlement demand within the policy limit"—in view of the fact that, under such circumstances, "it is wholly within the insurer's power to prevent exposure [of] its insured's personal assets." [38] (Emphasis in original.) Travelers contends that, in contrast to the single claimant situation, the *Asermely* rule should not apply where there are multiple claimants for the policy proceeds with claims that in the aggregate exceed the policy limits—because in such a situation the insurer does not have the ability to prevent exposure of the insured's personal assets—since paying the entire policy limits to one claimant would leave the insured without protection against the other claim(s). Travelers contends that, under such circumstances, imposing *Asermely* liability on an insurer for rejecting one claimant's demand for the policy limits "would effectively place the interests of that claimant above that of the insured defendant." Accordingly, Travelers asserts that an insurer's rejection of one claimant's demand is insufficient in and of itself to prove a breach of its fiduciary duty; rather, it argues that a "more searching inquiry is required * * *."

Travelers contends that the appropriate standard should be a "reasonableness standard" such as that endorsed by the First Circuit in *Peckham v. Continental Casualty Insurance Co.,* 895 F.2d 830, 835 (1st Cir.1990)—rather than what Travelers describes as the "assumption of risk" standard imposed by the rule in *Asermely.*[39] Travelers submits that the hearing justice "correctly called for [the] application of a 'reasonableness' standard" in her decision (which, the reader will recall, explicitly cited *Peckham* ), but it argues that the factual determination as to whether it should have settled with Mr. DeMarco for the policy limits and the assessment of the reasonableness of its conduct should be made by a jury; accordingly, Travelers contends that the hearing justice erred in granting summary judgment.[40]

Travelers further contends that, from a public policy perspective, affirming the hearing justice's decision could have "se-

---

**38.** The quoted language is from Travelers' brief to this Court.

**39.** We note, as do the *amici curiae,* that this Court has not specifically stated whether *Asermely* announces a strict liability or a negligence standard when applied in a case involving a single claimant who makes a settlement offer within the policy limit, and we need not reach that issue in deciding the case before us. However, we would observe that, in our opinion in *Travelers Insurance Co. v. Hindle,* 748 A.2d 256, 260 (R.I.2000), dis-

cussed in the text, *supra,* we referred to "[t]he reasonableness standard articulated in *Asermely* and its progeny" and described it as "necessarily flexible."

**40.** In its brief to this Court, Travelers notes that the Fifth Circuit's opinion in *Davis,* 412 F.2d at 480, (which was cited by the hearing justice in her rescript opinion) held that it was "for the jury to decide whether the refusal to settle was primarily in [the insurer's] own interests and with too little regard for its insured's interests."

vere" consequences for policyholders, claimants, and insurers. Travelers argues that an "inflexible rule compelling an insurer to pay its policy limit to one of multiple claimants [in order] to avoid liability for a judgment in excess of the policy limit" would harm policyholders (1) by leaving them without insurance coverage for the remaining claims and (2) by requiring them to cover the cost of defending against the other claims—because, in Travelers' words, an insurer's "duty to defend ends when the policy limit has been paid." Such a rule, Travelers urges, would encourage insurance companies to place their own interests and the interests of one or more third parties above the interests of the insureds. In addition, Travelers argues that injured claimants would be harmed because such an "inflexible rule" would create "an unprincipled race to be the first to present the insurer with a policy limit demand," leaving some claimants with no recovery and undermining efforts by insurers to apportion policy proceeds based on the relative severity of the claimants' injuries.

Mr. DeMarco, for his part, argues that the primary issue to be resolved by this Court in passing upon Travelers' appeal "*is not* necessarily the extent to which [*Asermely*] applies generally in cases where more than one injured party is making a claim against the policy limit," but rather it is "the extent to which Travelers is responsible for a significant excess judgment against its insured in the narrow context of the egregious undisputed facts of this case." (Emphasis in original.) Mr. DeMarco asserts that, contrary to Travelers' contention, the hearing justice *did* consider the reasonableness of Travelers' conduct, and he contends that the undisputed facts established that Travelers acted unreasonably as a matter of law under *Asermely*.

Mr. DeMarco argues that Travelers' "failing to engage in any settlement negotiations and forcing the DeMarco claim to trial" did not satisfy the insurer's duty of eliminating as much exposure of its insureds to personal liability as possible. Mr. DeMarco asserts that, if Travelers had settled with him for the policy limits prior to the personal injury trial, it "would have protected its insureds by minimizing their maximum potential exposure on the unresolved claim" to $450,000 (the amount for which the other injured party, Mr. Woscyna, was willing to settle prior to the DeMarco trial). Instead, Mr. DeMarco contends, because Travelers failed to settle with him and opted to proceed to trial, "the exposure of Travelers' insureds ballooned from $450,000 to approximately $3,250,000 following the verdict"—the latter amount representing the sum of the approximately $2,800,000 verdict (with interest) added to the $450,000 for which Mr. Woscyna settled after trial. Accordingly, Mr. DeMarco argues, Travelers' failure to settle with him for the policy limits prior to trial placed its insureds in a much worse position than if the insureds had faced direct liability only with respect to the Woscyna claim. Mr. DeMarco further contends that Travelers made a conscious decision not to engage in any settlement negotiations because it took the position that *Asermely* would not apply in a multiple claimant case. He then proceeds to argue that the hearing justice appropriately granted summary judgment on count one of his complaint because, "[a]s a matter of law, conduct of this nature by an insurance company cannot be deemed reasonable."

Although Mr. DeMarco argues that, due to what he characterizes as the "egregious" facts of this case, this Court is not required to decide whether *Asermely* applies in multiple claimant cases, he also contends that "there is nothing contained

in the specific language of the *Asermely* decision" which would suggest that its broad, policy-based principles should not be applicable in the multiple claimant context. Mr. DeMarco acknowledges that multiple claimant cases are "clearly more complicated" than single claimant cases, but he asserts that an insurer facing multiple claimants should be required "to proceed even more cautiously" than in the single claimant context—keeping in mind its duty under *Asermely* and *Skaling II* to (1) engage in timely and meaningful settlement negotiations[41] and (2) to eliminate (in plaintiff's words) "as much risk and excess exposure to its insured as may be possible under the circumstances." Agreeing with the reasoning and language contained in the rescript decision of the hearing justice in the instant case, Mr. DeMarco suggests that an appropriate standard in multiple claimant cases would be the standard set forth by the First Circuit in *Peckham*[42]— *i.e.*, that an insurer's liability for failure to settle should, in the words of the hearing justice, "turn on its exercise of professional skill and good faith in making that judgment call * * *."

In response to Travelers' contention that applying the *Asermely* rule to multiple claimant cases would have negative public policy consequences, plaintiff asserts (1) that this state has an "overriding concern" in favor of promoting the settlement of controversies in lieu of litigation and (2)

that this "overriding concern" is advanced by requiring insurers to engage affirmatively in settlement negotiations.

In approaching the question of the applicability of the *Asermely* rule to this case, we first have carefully scrutinized the analyses contained in the opinions of certain other appellate courts that have considered an insurer's duty to its insured where there are multiple claimants whose claims in the aggregate exceed the policy limits. In *Peckham v. Continental Casualty Insurance Co.*, 895 F.2d 830 (1st Cir.1990), the United States Court of Appeals for the First Circuit discussed an insurer's duty when faced with what the court described as the "thorny problem" of an "excess-limits case." *Peckham*, 895 F.2d at 835. The court noted that such cases are "complicated logarithmically when multiple claims exist, each likely to outstrip the coverage." *Id.* When "policy limits are much lower than the insured's potential exposure," the court observed, "the insurer cannot put its own interests first, but must negotiate as it would if its liability limits were unbounded." *Id.* at 834 (citing *Murach v. Massachusetts Bonding and Insurance Co.*, 339 Mass. 184, 158 N.E.2d 338, 341 (1959)).[43] The First Circuit in *Peckham* explained that "the duty to negotiate in good faith would require the carrier * * * to treat the claim as if [the carrier] were alone liable for the entire amount," and it further noted that, "in

---

**41.** It will be recalled that *Skaling v. Aetna Insurance Co.*, 799 A.2d 997, 1005 (R.I.2002) (*Skaling II* ), emphasized that an insurer has "an *affirmative duty* to engage in timely and meaningful settlement negotiations * * *." (Emphasis added.)

**42.** It is noteworthy that both parties to this appeal explicitly cite *Peckham*, 895 F.2d 830, in support of their respective arguments.

**43.** In *Murach v. Massachusetts Bonding and Insurance Co.*, 339 Mass. 184, 158 N.E.2d

338, 341 (1959), a case that is cited favorably by the First Circuit in *Peckham*, the Supreme Judicial Court of Massachusetts stated that, although the settlement of claims is within an insurer's discretion, "[t]o mitigate the danger * * * that the insurer will favor its own interest to the exclusion of the insured's[,] good faith requires that it make the decision (whether to settle a claim within the limits of the policy or to try the case) *as it would if no policy limit were applicable to the claim.*" (Emphasis added.)

such straitened circumstances, the insurer must inform the insured of its conflicting interests, advise him of his rights, and keep him abreast of settlement offers and meaningful developments." *Id.* (internal quotation marks omitted). In language of helpful clarity, the First Circuit in *Peckham* went on to state:

"The insurer has both the right and the duty to exercise its professional judgment in settling, or refusing to settle, such claims—but it must do so mindful of the insured's best interests and in good faith. The insurer's goal should be to try to effect settlement of all or some of the multiple claims so as to relieve its insured of so much of his potential liability as is reasonably possible, considering the paucity of the policy limits. So long as it acts in good faith, the insurer is not held to standards of omniscience or perfection; it has leeway to use, and should consistently employ, its honest business judgment. The carrier, in fine, will not be held to prophesy." *Id.* at 835 (internal citation and quotation marks omitted).

In support of the just-quoted statement concerning the insurer's "right" and "duty" in the multiple claimant context, the First Circuit cited to Judge John Minor Wisdom's opinion for the United States Court of Appeals for the Fifth Circuit in *Liberty Mutual Insurance Co. v. Davis*, 412 F.2d 475 (5th Cir.1969). In *Davis*, the Fifth Circuit upheld the trial court's determination that an insurer had acted in bad faith where it failed to settle with one claimant for the insured's policy limits due to the fact that it was faced with multiple claimants whose claims were expected to exceed the policy limits. The Fifth Circuit observed:

"When several claimants are involved, and liability is evident, rejection of a single offer to compromise within policy limits does not necessarily conflict with the interest of the insured. He hopes to see the insurance fund used to compromise as much of his potential liability as possible. Of course, if the fund is needlessly exhausted on one claim, when it might cancel out others as well, the insured suffers from the company's readiness to settle. To put the point another way, even if liability be conceded, plaintiffs will usually settle for less than they would ultimately recover after trial, if only to save time and attorney's fees. * * * But where the insurance proceeds are so slight compared with the totality of claims as to preclude any chance of comprehensive settlement, the insurer's insistence upon such a settlement profits the insured nothing. He would do better to have the leverage of his insurance money applied to at least some of the claims, to the end of reducing his ultimate judgment debt." *Davis*, 412 F.2d at 480–81.

The Fifth Circuit in *Davis* went on to conclude that "efforts to achieve a prorated, comprehensive settlement may excuse an insurer's reluctance to settle with less than all of the claimants, but need not do so." *Id.* at 481. Stating that this "question is for the jury to decide," the court in *Davis* then set out the factors which the jury should be instructed to consider in a multiple claimant case:

"Here, bearing in mind the existence of multiple claims and the insured's exposure to heavy damages, did the insurer act in good faith in managing the proceeds in a manner reasonably calculated to protect the insured by minimizing his total liability? In many cases, efforts to achieve an overall agreement, even though entailing a refusal to settle immediately with one or more parties, will accord with the insurer's duty. In other cases, use of the whole fund to cancel

out a single claim will best serve to minimize the defendant's liability." *Id.*

We are persuaded that the principles that undergird our decisions in *Asermely* and *Skaling II* also apply in cases involving multiple claims for insurance policy proceeds, which claims in the aggregate exceed the policy limits. We are further persuaded that the flexible standards set forth by the First Circuit in *Peckham* and the Fifth Circuit in *Davis* constitute the most sensible and jurisprudentially sound way to approach the complex issues involved in multiple claimant cases where the available insurance proceeds are decidedly finite. Today we further explicate an insurer's obligations under the rule announced in *Asermely* so as to address the complicated set of considerations with which an insurer must grapple in deciding whether and how to settle particular claims in a multiple claimant case. At the same time, we would emphasize that today's holding in no way lessens an insurer's fiduciary obligation to act in the best interests of its insured by refraining from taking steps that "demonstrate greater concern for the insurer's monetary interest than the financial risk attendant to the insured's situation," *Asermely*, 728 A.2d at 464 (internal quotation marks omitted); nor does this holding lessen in any way an insurer's "*affirmative duty* to engage in timely and meaningful settlement negotiations and to make and consider offers of settlement consistent with an insurer's fiduciary duty to protect its insured from excess liability." *Skaling II*, 799 A.2d at 1005 (emphasis added).

Because insurers have such a weighty fiduciary duty with respect to settlement negotiations and the litigation of cases involving their insureds, it is helpful to focus on an insurer's obligations in the multiple claimant context to ensure that insurers

will act in the best interests of their insureds; the need for a recognition of such obligations is as acute in the multiple claimant situation as it is in the single claimant situation. However, we recognize that, unlike what was possible in the single claimant situation at issue in *Asermely*, in a multiple claimant case it will not always be possible for an insurer, by exhausting the policy limits, to guarantee that its insured will not face direct liability—due to the fact that other claims may still be outstanding.

It is clear that an insurer may have to engage in a much more complex assessment of whether and how to settle claims in order to meet its duty to protect its insured's best interests in the face of multiple claims, the aggregate of which exceeds the policy limits. However, it is also clear that such complexities do not relieve an insurer of its "affirmative duty to engage in timely and meaningful settlement negotiations"[44] in spite of the sometimes Sisyphean challenge that reaching a global settlement within the policy limits represents. There undoubtedly will be some instances where an insured will still face direct liability even in the face of the fact that the insurer acted in the insured's best interests; even in such a situation, however, the critical issue to be determined is whether or not the insurer did everything it reasonably could to minimize the amount of that direct liability.

We hold that, when an insurer is faced with multiple claimants with claims that in the aggregate exceed the policy limits, the insurer has a fiduciary duty to engage in timely and meaningful settlement negotiations in a purposeful attempt to bring about settlement of as many claims as is possible, such that the insurer

---

44. *Skaling II*, 799 A.2d at 1005.

will thereby relieve its insured of as much of the insured's potential liability as is reasonably possible given the policy limits and the surrounding circumstances. *See Peckham,* 895 F.2d at 835; *Davis,* 412 F.2d at 480–81; *Skaling II,* 799 A.2d at 1005. In meeting this duty, the insurer must negotiate as if there were no policy limits applicable to the claims and as if the insurer alone would be liable for the entire amount of any excess judgment. *See Peckham,* 895 F.2d at 834; *Murach,* 158 N.E.2d at 341. The insurer must exercise its best professional judgment throughout this process, always keeping in mind the best interests of its insured and the necessity of minimizing its insured's possible eventual direct liability. As with the *Asermely* rule when it is applied in the single claimant situation, in order to show that an insurer has violated its fiduciary duty in a multiple claimant case, the insured (or a party to whom the rights of the insured have been assigned) need not demonstrate that the insurer acted in bad faith but only that the insurer did not act reasonably and in its insured's best interests in light of the surrounding circumstances. *See Asermely,* 728 A.2d at 464; *see also Skaling II,* 799 A.2d at 1005–06.

In determining whether an insurer has met its duty in a multiple claimant case, it will be necessary to engage in a comprehensive factual analysis, taking into account all of the surrounding circumstances in the particular case. Such circumstances would include, *inter alia:* the number of claimants; the relative extent of the damages suffered by each claimant; the time at which the extent of those damages was made known to the insurer; the amounts of the claimants' settlement demands; the wishes of the insured; the timing and nature of the insurer's attempts at negotiating a settlement; the perceived likelihood of litigation being commenced by a particular claimant; and the relative willingness of the various claimants to settle.

In the instant case, it must be determined by a fact-finder whether Travelers met its duty to engage in timely and meaningful settlement negotiations with the goal being to relieve its insureds of as much of their potential liability as was reasonably possible. The determination of the reasonableness of an insurer's action in multiple claimant cases will normally be a question for a fact-finder to decide. *See Davis,* 412 F.2d at 480 (stating that it was "for the jury to decide whether the refusal to settle was primarily in [the insurer's] own interests and with too little regard for the insured's interests"); *Southern General Insurance Co. v. Holt,* 262 Ga. 267, 416 S.E.2d 274, 276 (1992) (noting that, in determining an insurer's liability for failure to settle a claim, "[t]he jury generally must decide whether the insurer, in view of the existing circumstances, has accorded the insured the same faithful consideration it gives its own interest") (internal quotation marks omitted); *see also R.E. King v. Avtech Aviation, Inc.,* 655 F.2d 77, 78 (5th Cir.1981) (stating that, although material facts are undisputed, a case requiring "the determination of the reasonableness of the acts and conduct of the parties under all the facts and circumstances of the case * * * cannot ordinarily be disposed of by summary judgment") (internal quotation marks omitted); *Shaffer v. Regions Financial Corp.,* 29 So.3d 872, 882 (Ala.2009) ("Ordinarily, [t]he question of reasonableness is one of fact to be resolved by the trier of fact.") (internal quotation marks omitted); *cf. Botelho v. Caster's Inc.,* 970 A.2d 541, 546–47 (R.I.2009) (agreeing with the trial justice's assessment that "there were significant factual issues still to be determined by the jury, concerning which issues reasonable persons might reach differing conclusions"); *Gliottone,* 870 A.2d at 1028 (noting that "it has been widely rec-

ognized that issues of negligence are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner") (internal quotation marks omitted); *DeNardo v. Fairmount Foundries Cranston, Inc.,* 121 R.I. 440, 448, 399 A.2d 1229, 1234 (R.I.1979) ("In Rhode Island the general rule is that negligence is a question for the jury unless the facts warrant only one conclusion.").

For the reasons set forth below, it is our opinion that the issue of whether Travelers met its duty under *Asermely* in the case at bar was not one that could properly have been resolved on summary judgment.

## 2. Remand for Further Proceedings

■ In view of the fact that we have today explicated the parameters of the *Asermely* rule as it is to be applied in multiple claimant cases where the combined claims exceed the policy limits, it is necessary for us to vacate the grant of summary judgment for plaintiff with respect to count one of his complaint and remand for further findings of fact so that it can be determined whether or not Travelers met its duty to its insureds. We also note that the record reveals that genuine issues of material fact exist regarding the actions of the parties with respect to efforts to settle the claims of Mr. DeMarco and Mr. Woscyna in the years leading up to the entry of judgment against Travelers' insureds in the personal injury case. It is clear to us that the existing record contains facts on which a fact-finder *could* conclude that Travelers acted reasonably and in its insureds' best interests under the explicated *Asermely* standard—and it is likewise clear that there are facts on the basis of which a fact-finder could reach the opposite conclusion.[45]

With respect to the instant case, it is for a fact-finder to determine the reasonableness of Travelers' actions in light of the surrounding circumstances—including the important factor of the presence of multiple claimants. We therefore hold that summary judgment should not have been granted with respect to count one, and we remand this case to the trial court for further proceedings consistent with the explications set forth in this opinion. We also take this opportunity to observe that it seems most appropriate for the issue of Travelers' liability for the excess judgment under the modified *Asermely* standard to be tried along with the bad faith claim, which is set forth in count four of plaintiff's original complaint and which plaintiff did not address in his motion for partial summary judgment.

## B

## Applicability of the Rejected Settlement Offer Statute

■ Travelers also contends on appeal that § 27–7–2.2 (the "rejected settlement offer statute")[46] is inapplicable to any case

---

**45.** It should be noted that among the factual issues that must be addressed on remand is the dispute as to whether or not the insureds were willing to have the policy limits paid to plaintiff.

**46.** General Laws 1956 § 27–7–2.2 has been aptly described by this Court as the "rejected settlement offer statute." *Skaling v. Aetna Insurance Co.,* 742 A.2d 282, 290 (R.I.1999) (*Skaling I*).

Section 27–7–2.2 provides as follows:

"In any civil action in which the defendant is covered by liability insurance and in which the plaintiff makes a written offer to the defendant's insurer to settle the action in an amount equal to or less than the coverage limits on the liability policy in force at the time the action accrues, and the offer is rejected by the defendant's insurer, then the defendant's insurer shall be liable for all interest due on the judgment entered by the court even if the payment of the

involving multiple claimants and insufficient policy limits. Travelers asserts (1) that the purpose of § 27–7–2.2 is to prevent an insurer from placing its own financial interests ahead of those of its insured by imposing liability on an insurer for all interest due on a judgment entered against its insured if the insurer chose not to settle the claim within the policy limits before trial, even though the insured had indicated that it would accept such a settlement; and (2) that the rationale for imposing liability on an insurer under § 27–7–2.2 for rejecting a settlement offer makes sense only in the context of a case in which there is a single claimant making a settlement demand within the policy limits. In such a situation, Travelers argues, it is entirely within the insurer's power to prevent its insured from facing direct liability (in the event that a trial results in a judgment against its insured in excess of the policy limits) by simply settling with the single claimant prior to trial. By contrast, Travelers argues that what it characterizes as the "strict liability imposed by § 27–7–2.2" should not apply in multiple claimant cases where the claims in the aggregate exceed the policy limits—since in such a situation an insurer would not be able to eliminate the risk of its insured facing exposure beyond the policy limits by accepting a settlement offer within the limits. Rather, Travelers contends that, even if the insurer accepted a settlement offer for the policy limits to avoid liability under § 27–7–2.2, the insured would still face direct liability for the amount of the other claim(s) in excess of the limits, due to the fact that the multiple claims exceeded the amount of the policy limits.

In his motion for summary judgment with respect to count two of his complaint,

Mr. DeMarco sought a declaration that Travelers was liable for the prejudgment and postjudgment interest that had accrued on the judgment in the personal injury action. In her decision granting the motion for summary judgment as to this count, the hearing justice ruled that the terms of § 27–7–2.2 are clear and unambiguous. Having so concluded, the hearing justice went on to rule that the statute clearly applied to Mr. DeMarco's case in view of the undisputed fact that, in the words of the hearing justice, "Travelers did not accept DeMarco's written offers to settle the action in an amount equal to the Travelers' policy limit."

This Court reviews questions of statutory interpretation *de novo*. *In re Brown*, 903 A.2d 147, 149 (R.I.2006); *see also State v. Germane*, 971 A.2d 555, 573 (R.I.2009). In our approach to that interpretive task, we have said that "our ultimate goal is to give effect to the General Assembly's intent." *Martone v. Johnston School Committee*, 824 A.2d 426, 431 (R.I. 2003). We have further stated that "[t]he plain statutory language is the best indicator of legislative intent." *State v. Santos*, 870 A.2d 1029, 1032 (R.I.2005); *see also Martone*, 824 A.2d at 431. And we have indicated that "a clear and unambiguous statute will be literally construed." *Martone*, 824 A.2d at 431; *see also Santos*, 870 A.2d at 1032. Accordingly, "when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *State v. DiCicco*, 707 A.2d 251, 253 (R.I. 1998) (internal quotation marks omitted); *see also Germane*, 971 A.2d at 574; *Chambers v. Ormiston*, 935 A.2d 956, 961 (R.I. 2007).

judgment and interest totals a sum in excess of the policy coverage limitation. This written offer shall be presumed to have

been rejected if the insurer does not respond in writing within a period of thirty (30) days."

This Court has previously described the language of § 27–7–2.2 as being "neither complex nor ambiguous." *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 291 (R.I. 1999) (*Skaling I*). Although we have considered Travelers' above-summarized arguments carefully, we remain persuaded that the rejected settlement offer statute is indeed unambiguous and requires that both prejudgment and postjudgment interest be assessed in the instant case. *See Skaling I*, 742 A.2d at 291. The clear and straightforward language of § 27–7–2.2 indicates that it applies to "*any* civil action * * * in which *the plaintiff* makes a written offer to the defendant's insurer to settle the action in an amount equal to or less than the coverage limits" and said offer is rejected by the defendant's insurer. (Emphasis added.) In such circumstances, the statute imposes liability on defendant's insurer for "all interest due on the judgment entered by the court even if the payment of the judgment and interest totals a sum in excess of the policy coverage limitation." *Id.*

Thus, in spite of the fact that this case at one time involved multiple claimants whose combined claims appeared to exceed the policy limits, the inexorable reality is that we are now confronted with a civil action involving only *one plaintiff,* Wayne DeMarco,[47] whose written offer to settle in an amount equal to the coverage limits was rejected by the insurer. Since we are not now confronted with multiple plaintiffs (as contrasted with multiple claimants making demands for policy proceeds), we need not reach the issue of the applicability (*vel non*) of § 27–7–2.2 in such a case. We simply hold that the provisions of the rejected settlement offer statute encompass

the case at bar and are to be applied on remand to the extent that Travelers is found liable.

## C
### Effect of the Release and the Judgment Satisfied Order

We next turn to the somewhat Byzantine issues that are implicated by Travelers' contention on appeal that, regardless of the applicability of *Asermely* and the rejected settlement offer statute in multiple claimant cases, in the instant case any claims that Mr. DeMarco might have had against it were extinguished (1) when he executed a document releasing its insureds from liability in exchange for an assignment of their rights against Travelers; and/or (2) when the trial justice in the personal injury action entered an order stating that the judgment in that case had been "satisfied."

### 1. The Release

■ Travelers argues that the hearing justice erred in not granting its cross-motion for summary judgment that was predicated on the fact that Travelers was able to eliminate "all liability" faced by its insureds for the amount of the judgment awarded to Mr. DeMarco in excess of the policy limits. Travelers asserts that its "rejection of the DeMarcos' demand for the $1 million policy limit did not harm" its insureds because Travelers "obtained releases for [Mr.] Doire and Virginia Transportation from the two claimants in exchange for its payment of the policy limit;" Travelers points out that, as a result, the insureds did not have to make any payments to the claimants from their own

47. We note that, for the purpose of ruling upon the applicability of § 27–7–2.2 in this case, we view Mr. DeMarco as being *"the* plaintiff"—due to the fact that the claims of

Mr. DeMarco's wife, Leesa DeMarco, and his minor children in the personal injury action are *derivative* claims for loss of consortium.

funds. Accordingly, Travelers argues that any possible rights or causes of action (including claims under *Asermely* and under the rejected settlement offer statute) that its insureds might have had against their insurer due to its rejection of Mr. DeMarco's settlement demands ceased to exist once the insureds were released from liability by Mr. DeMarco and Mr. Woscyna—since, Travelers contends, the signing of those releases meant that, as of that instant, the insureds no longer suffered any harm that could form the basis of a claim against the insurer. Travelers essentially argues that what it describes as its insureds' "purported assignment" of rights to Mr. DeMarco in fact assigned him nothing at all—and, because in Travelers' view Mr. DeMarco possessed no rights against it independent of those formerly held by the insureds, his claims should therefore have been dismissed.

More specifically, Travelers points to the fact that Mr. DeMarco executed a "general release" of the insureds as opposed to "a covenant or promise not to execute upon the judgment against them * * *." Travelers submits that a number of jurisdictions outside Rhode Island have determined that a release and a covenant not to execute have different legal effects. Generally, such jurisdictions have held that a general release fully discharges an insured from liability; by contrast, a covenant not to execute on a judgment does not discharge the insured's underlying liability, and the insured therefore retains rights against the insurer that may properly be assigned.[48]

Although this Court has never addressed the issue of whether in this state there should be a meaningful legal distinction between a release and a covenant not to execute on a judgment in a context such as the present one, Travelers argues that we (1) should enforce the release executed by Mr. DeMarco "according to its plain terms" and (2) thereby hold that the release fully extinguished its insureds' liability for the judgment entered against them in the DeMarco personal injury action such that they no longer had any rights or claims against Travelers with respect to that judgment that they could assign to plaintiff. Travelers also asserts that enforcing the terms of the release would work no injustice because, in Travelers' view, plaintiff was "under no compulsion to provide [Mr.] Doire and Virginia Transportation with a general release, as opposed to a covenant or agreement not to execute on the judgment." Travelers contends that the "choice of a general release was the product of an arm's-length negotiation" between plaintiff and the insureds, each independently represented by counsel; Travelers further contends that the "clear language of the General Release drafted by the DeMarcos' counsel reflects that the DeMarcos received what they bargained for."

In response, Mr. DeMarco argues that Travelers did not, in fact, obtain a release for its insureds "in exchange for" the payment of policy proceeds to Mr. DeMarco. Rather, Mr. DeMarco contends that "Travelers had no involvement whatsoever in procuring this general release, which was part and parcel of a larger settlement agreement that also included an assignment of the insureds' rights and claims against Travelers and the legal malpractice claim to DeMarco." Mr. DeMarco asserts that the settlement between Trav-

---

**48.** *See, e.g., McLellan v. Atchison Insurance Agency, Inc.,* 81 Hawai'i 62, 912 P.2d 559, 563–64 (1996); *see also A Tumbling–T Ranches v. Flood Control District of Maricopa County,* 220 Ariz. 202, 204 P.3d 1051, 1058 (2008); *Tip's Package Store, Inc. v. Commercial Insurance Managers, Inc.,* 86 S.W.3d 543, 555 (Tenn.Ct.App.2002).

elers' insureds and him "was reached irrespective of Travelers' gratuitous partial payment" to him of $550,000 from the policy proceeds; he further asserts that he would have released the insureds solely in exchange for an assignment of rights against Travelers. Mr. DeMarco also notes that, prior to the November 17, 2006 mediation (at which time Travelers agreed to pay the policy proceeds to Mr. Woscyna and him), Travelers had been informed that the insureds and he were already in extrajudicial settlement negotiations concerning an assignment of claims to him "without any monetary contribution" from Travelers. Mr. DeMarco contends that the only reason Travelers paid him the $550,000 (the amount that remained after settling Mr. Woscyna's claim for $450,000) was to exhaust the policy limits so that its declaratory judgment action in federal court would be ripe.

Mr. DeMarco further argues that drawing a distinction between a general release and a covenant not to execute in this case would be "to advance technical legal arguments relative to the form of documents over the true substance, spirit and intent of the parties in executing those documents * * *." Mr. DeMarco asserts that the execution of a general release "was absolutely necessary to facilitate the assignment and allow Virginia [Transportation] to remain in business * * *." He notes that Virginia Transportation was not "a judgment-proof defendant with the luxury of allowing the excess judgment to linger and remain in place under a covenant not to execute while this litigation pressed on for many more years;" rather, he argues, in order to avoid bankruptcy, Virginia Transportation needed to satisfy its lenders "that the settlement with De-

Marco eliminated the event of default caused by the excess judgment itself * * *." Mr. DeMarco further contends that the release executed by him was the "sole reason" that Travelers' insureds (Mr. Doire and Virginia Transportation) "were saved from certain corporate and personal financial ruin." Mr. DeMarco states that he and the insureds structured the settlement documents in order to "specifically preserve any and all claims" against Travelers and in order to "prevent the excess judgment from forcing Virginia [Transportation] into bankruptcy." He also argues that, if the assignment of claims were to be held to be invalid due to the existence of the release document, he would be forced to pursue further litigation against the insureds under the theory that the settlement agreement failed for lack of consideration.

This case does not require us to address the hypothetical question as to what, in other factual contexts, might be the differential effect of a general release as opposed to a covenant not to sue or execute on a judgment—because in the instant case it is clear that the release document, when read together with the virtually simultaneous assignment of rights document, does not fit neatly into either category, especially in view of the rather unusual circumstances surrounding the execution of those documents. The fact that the release and assignment documents were executed contemporaneously,[49] the fact that there is explicit language in the release document indicating that Travelers was not being released from liability, and the evidence tending to show that the insureds would not have been released but for the assignment of rights, all distinguish the instant case

---

**49.** It will be recalled that there is explicit language in the assignment document stating that the assignment of claims was effected "in consideration of the General Release *executed contemporaneously herewith* * * *." (Emphasis added.)

from the more typical situation in which an assignment of rights is alleged to be effective in spite of a "general release" of an insured from liability.

Bearing in mind the case-specific factors that are summarized in the previous paragraph, we proceed next to analyze the actual legal effect of the release and assignment documents. In conducting this analysis, we shall seek guidance from our own case law as well as that of other jurisdictions.

This Court has upheld as being generally permissible an assignment of rights in a situation similar to that which the instant case presents. In *Mello v. General Insurance Co. of America*, 525 A.2d 1304 (R.I. 1987), we upheld an assignment where (1) judgment had entered against an insured in excess of the policy limits and (2) the insured assigned its claim against the insurer for bad faith failure to settle in exchange for an agreement by the injured plaintiff not to levy execution against the insured. *Id.* at 1305–06. Notably, in *Mello* we drew on reasoning found in this Court's earlier opinion in *Etheridge v. Atlantic Mutual Insurance Co.*, 480 A.2d 1341 (R.I.1984), which involved insureds covered under policies provided by two different insurers. In that case, the insureds had entered into a structured settlement agreement with the injured party and one of the insurers, and they assigned to that insurer the claims that they had against the second insurer. The second insurer argued that the settlement agreement involved an unenforceable assignment of a personal injury claim because the injured party had been "fully satisfied" and all rights that he had with respect to

his claim were extinguished. *Id.* at 1343. We upheld the assignment, stating (in words that we consider to have considerable relevance to the case at bar) that "[i]n examining such an agreement, we shall look to *substance rather than to form.*" *Id.* at 1345 (emphasis added). The Court reasoned as follows:

> "Such agreements ought not to be rendered void or impeded by the simplistic maxim that the common-law assignments of personal-injury claims were unenforceable. * * * We simply cannot allow a salutary rule to be applied in a context in which it has no meaning and thereby obstruct an appropriate device for the payment of a claim by an insurance carrier that has an obligation to its insured to absolve him of liability without depriving itself of the right to pursue action against another insurance carrier that it considers to be wholly or partly liable for the loss." *Id.*

The Court in *Mello* found this reasoning in the *Etheridge* opinion applicable to the situation before it, holding that an insured could assign to an injured claimant a bad faith claim against the insurer "for the limited purpose of recovering the difference between the judgment received against the insured and the insurance-policy limits." *Mello*, 525 A.2d at 1306.[50]

In view of the fact that this Court has not previously had occasion to decide what, if any, legal distinction there may be between a release and a covenant not to execute in a context such as the instant case presents, Mr. DeMarco points to the case of *Campione v. Wilson*, 422 Mass. 185, 661 N.E.2d 658 (1996), decided by the Supreme Judicial Court of the Common-

**50.** It is noteworthy that the plaintiff in the seminal *Asermely* case also brought her action against the insurer pursuant to an assignment of rights from the insureds, although this Court's opinion in that case did not specify whether the assignment had been made in consideration of a release or a covenant not to execute on the judgment. *Asermely*, 728 A.2d at 462.

wealth of Massachusetts, in support of his argument that the release document that he signed did not render nugatory the insureds' assignment of claims. In *Campione*, the Supreme Judicial Court upheld an insured's assignment of excess liability claims to a third party; the Massachusetts court further specifically held that the assignment was not invalidated by a release executed by the third party in favor of the insured. In the *Campione* case, the plaintiffs had brought an action against the insured for wrongful death and other claims resulting from a motor vehicle accident. *Id.* at 660. Prior to trial, the parties reached a settlement agreement whereby (1) judgment would enter for the plaintiffs and (2) the insured assigned to the plaintiffs his claims against his insurance brokers for negligent failure to obtain adequate insurance. *Id.* In exchange for the assignment of claims, the plaintiffs agreed not to seek satisfaction from the insured for the judgment amount, and they also released the insured "from any and all claims" arising out of the underlying accident and death; the release was expressly conditioned on the insured's agreeing to cooperate with the plaintiffs in their pursuit of any claims brought in connection with the assignment. *Id.* at 660–61.

The plaintiffs then brought a negligence action against the insurance brokers pursuant to the assignment of rights, but the trial court ordered that the plaintiffs' negligence action should be dismissed because the insured "had not suffered any tangible damages attributable to the defendants' alleged negligence, and, thus, had no assignable claim." *Campione*, 661 N.E.2d at 661. The trial judge reasoned that, due to the fact that the plaintiffs had released the insured from liability at the time that judgment entered, the insured was never liable for damages in excess of the policy limits and accordingly had no claim that could be assigned. *Id.*

The plaintiffs appealed, and in due course the Supreme Judicial Court issued an opinion vacating the judgment of the trial court and remanding the case for further proceedings. The Supreme Judicial Court observed that there was "a split in authority as to whether a tortfeasor who has been released from the legal obligation to pay has any right against an allegedly negligent insurer which could be assigned to an injured party." *Campione*, 661 N.E.2d at 662. The court went on to state that the "majority rule" was that entry of an excess judgment "coupled with a release (or a covenant not to execute) in favor of the insured, does not invalidate an accompanying assignment of the right to sue the insurer for negligence." *Id.* (parenthetical language in the original). The court then observed that the conflict among various jurisdictions reflected "a balancing of policy considerations"—including the risk of collusion between the insured and the injured party. *Id.* It noted that other courts were concerned about the opportunity for collusion where the insured assigns its rights to the injured party in exchange for a release insulating the insured from liability *prior* to the entry of judgment against the insured in the underlying action, due to the fact that under such circumstances the insured would lose the incentive to contest liability or the extent of damages during subsequent negotiations or at trial. *Id.*

The Supreme Judicial Court in *Campione* then proceeded to examine the decision of the United States Court of Appeals for the District of Columbia Circuit in *Gray v. Grain Dealers Mutual Insurance Co.*, 871 F.2d 1128 (D.C.Cir.1989), noting that the *Gray* court had rejected the risk of collusion as a basis for deciding whether an assignment accompanied by a release was effective. *Campione*, 661 N.E.2d at 662. In *Gray*, the injured party had

brought a personal injury action against the insured in connection with a motor vehicle accident. *Gray,* 871 F.2d at 1129. The injured party offered to settle the case for the insured's policy limits, but the insurance company did not respond to that offer, nor did it take any steps to defend the insured against the lawsuit brought by the injured party. *Id.* A default judgment was eventually entered against the insured for an amount more than $300,000 in excess of his insurance policy limits. *Id.* Thereafter, the insured "agreed to assign his claim against the insurance company" to the injured party; the insured did so "in exchange for [the injured party] releasing [the insured] of any obligation to pay the judgment." The injured party then brought suit against the insurance company for the judgment amount. *Id.* In response, the insurance company argued that its only duty was to indemnify the insured and that, because the insured had been released from liability, the company's liability to the insured was also extinguished. *Id.* If this were true, the *Gray* court observed, then it would follow that "that which [the insured] assigned to [the injured party] was worthless upon transfer." *Id.* at 1132.

The Supreme Judicial Court in *Campione* specifically noted that the District of Columbia Circuit in *Gray* had not been "particularly impressed with what it [*i.e.,* the D.C. Circuit] termed the '*somewhat metaphysical contention*' * * * that the legal basis for the claim against the insurer disappeared when the insured became insulated from liability due to a release or a covenant not to execute." *Campione,* 661 N.E.2d at 662 (quoting *Gray,* 871 F.2d at 1132–33) (emphasis added). The court in *Campione* then noted that the D.C. Circuit in *Gray* had determined that "when the insurance policy, the assignment, and the release executed by the parties *were considered together,* the as-

signment was effective * * *." *Id.* (emphasis added). The Supreme Judicial Court stated that it considered the reasoning in *Gray* to be persuasive and that it could "discern no compelling reason not to recognize the assignment of the negligence claims." *Id.* Rather, the court in *Campione* observed:

"It is appropriate to give effect to agreements which have led to a carefully negotiated and detailed settlement, in which the plaintiffs have voluntarily assumed the burden of proving any claims that [the insured] might have against the [insurance broker], in a situation where [the insured's] liability for the accident is reasonably clear, the primary insurer has paid the full limits of its policy, and damages are substantial." *Id.* at 663.

The court stated that it was "reluctant to foreclose the possibility" of such a settlement agreement whereby the insured was given "the benefit of being free from personal liability amounts beyond its certain insurance limits in exchange for [the insured's] cooperation in assisting the plaintiffs in their efforts to assert [the insured's] claims against the [insurance broker]." *Id.* at 662, 663.

It is also our view that the opinion of the United States Court of Appeals for the Second Circuit in the case of *Pinto v. Allstate Insurance Co.,* 221 F.3d 394 (2nd Cir.2000), sets forth an analysis that is particularly helpful in deciding the issues before us. In that case, the court upheld an assignment of rights given in exchange for a general release where an injured plaintiff received a judgment in excess of policy limits against an insured, who then assigned his right to proceed against his insurer for bad faith in refusing to settle. *Id.* at 398. The assignment was made in consideration of a "general release" discharging the insured's personal liability to

the plaintiff for the excess judgment. *Id.* The insurer argued (1) that the release made the excess judgment unenforceable against its insured and (2) that, therefore, the insured could no longer pursue a bad faith claim against the insurer and so had no rights to assign to the injured plaintiff. *Id.* at 403. In considering this argument, the Second Circuit first noted that an assignment of a bad faith claim to the plaintiff in a personal injury suit "is the ordinary mechanism for pursuing such [a] claim against the insurer," although such an assignment was "usually in exchange for a covenant not to execute on the judgment." *Id.*

The Second Circuit in *Pinto* next turned to the question of whether the "use of a release instead of a covenant not to execute (or not to sue or to forbear) as consideration for the assignment" rendered the excess judgment unenforceable. *Pinto,* 221 F.3d at 403 (parenthetical language in the original). The court in *Pinto* observed that "a release like any contract must be construed to give force and effect to the intention of the parties." *Id.* at 404. In support of the latter statement, the Second Circuit quoted approvingly from the Restatement (Second) *Contracts* § 284, cmt. c. (1981), which states:

> "The principal purpose of the obligee is given great weight if it can be ascertained * * *. If a literal interpretation of a writing that purports to be a release would frustrate that purpose, the writing may be interpreted as a contract not to sue." *Pinto,* 221 F.3d at 404.

The Second Circuit determined that, in the case before it, the parties intended to preserve the bad faith claim and allow the injured plaintiff to pursue the claim as the assignee of the insured. The court based that conclusion on (1) the fact that the language of the assignment recited that it was being made "[i]n consideration of a general release" from the injured plaintiff and (2) the fact that the release document stated that it was "in consideration" of the assignment of the bad faith cause of action. *Id.* In straightforward language, the Second Circuit in *Pinto* made the following statement about a key aspect of that case:

> "It defies common sense to believe that [the injured plaintiff] contemplated receiving as consideration for her release of [the insured] a right of [the insured] that no longer existed." *Id.*

The court further observed that, although the parties "may not have chosen the ideal form to execute their intention," courts have ignored the formal distinction between a release and a covenant not to sue "in order to avoid an unjust result." *Id.* While noting that it was "conscious that more careful drafting would have avoided this issue by using the more conventional form of consideration for the assignment," the court determined that the exchange of a general release for an assignment of a bad faith claim "operates to preserve the bad faith claim, as if the parties had executed a covenant not to sue," and it accordingly upheld the validity of the assignment of rights to the injured plaintiff. *Id.*

We deem the reasoning of the Supreme Judicial Court in *Campione,* the D.C. Circuit in *Gray,* and the just-summarized reasoning of the Second Circuit in *Pinto* to be highly persuasive with respect to the instant case. As was the case in *Pinto,* Mr. DeMarco and the insureds may not have chosen "the ideal form" when, in exchange for the assignment of rights, a "general release" document (rather than a covenant not to sue or execute on the judgment document) was contemporaneously executed. However, after reviewing the relevant documents (*viz.,* the "general release" and the assignment document), it is our opinion that the release document should not be

construed as depriving the assignment document of meaningfulness; in our judgment, to so interpret the release document would certainly lead to "an unjust result" under the somewhat unusual factual circumstances of this case. *See Pinto*, 221 F.3d at 404.

We first note that a release is a contractual agreement and that the rules of interpretation generally applicable to contracts are also applicable to writings that purport to be releases. *See Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 558 (R.I.2009) ("A release is a contractual agreement, and the various principles of the law of contracts govern the judicial approach to a controversy concerning the meaning of a particular release."); *see also* Restatement (Second) *Contracts* § 284, cmt. *c.* (1981); 29 *Williston on Contracts* § 73:7 (4th ed.2003).

In the instant case, rather than narrowly focusing on the release instrument, we shall look to the intention of the parties as expressed in the *two contemporaneously executed* written documents to determine whether the release document is to be understood as being in effect a covenant not to sue. *See* 29 *Williston on Contracts* § 73:8 at 27 ("Whether a particular writing is to be construed as a release or as a covenant not to sue is determined by the manifested intention of the parties, not by the form of the instrument."); *see also Pinto*, 221 F.3d at 404. As this Court stated in examining the assignment of rights at issue in *Etheridge*, in a context such as this "we shall look to substance rather than to form." *See Etheridge*, 480 A.2d at 1345.

Accordingly, in determining the intention of the parties as expressed in the release document, we examine that document *together with* the assignment document, which was executed contemporaneously with the release and as part of the same settlement agreement between Mr. DeMarco and the insureds. We have previously expressly stated that, as a general rule, "instruments executed at the same time, for the same purpose and in the course of the same transaction * * * are to be considered as one instrument and are to be read and construed together." *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I. 1996) (omission in original) (internal quotation marks omitted); *see also Rhode Island Depositors Economic Protection Corp. v. Coffey and Martinelli, Ltd.*, 821 A.2d 222, 226 (R.I.2003); *Maderios v. Savino*, 418 A.2d 839, 842 (R.I.1980); *Old Kentucky Distributing Corp. v. Morin*, 50 R.I. 163, 165, 146 A. 403, 404 (1929). Because the release and assignment documents were executed contemporaneously on November 17, 2006, it is clear to us that those documents should be construed together.

It is clear from an examination of the language of the release and assignment documents in the case at bar that the contracting parties sought to make it possible for Mr. DeMarco to pursue claims against Travelers, including claims under *Asermely* and for bad faith. Mr. DeMarco, in a separate paragraph in his release document, unequivocally stated:

"This General Release shall not in any way be construed, *nor is it intended,* to release Travelers * * * from any and all claims that Releasors may have against Travelers in any way arising from the Litigation or any aspect thereof. The same are *specifically reserved* by Releasors." (Emphasis added.)

Even though the document was entitled "General Release," Mr. DeMarco took care to expressly carve out Travelers from the reach of the release document. Further, as was the case with the assignment document at issue in the *Pinto* case in the Second Circuit, the document whereby the

rights of Virginia Transportation and Mr. Doire were assigned in the instant case expressly states that it was executed *"in consideration of the General Release executed contemporaneously herewith * * *."* (Emphasis added.) Although the release executed by Mr. DeMarco does not explicitly state that it was made in consideration of the assignment, we do not consider that omission to be an Achilles' heel—because we consider it mandatory to read the two contemporaneous documents *together*, and the assignment document clearly states that it was executed "in consideration of the General Release * * *."[51] In view of the fact that the release document was executed contemporaneously with the assignment document, which *does* explicitly refer to the release, we are satisfied that both parties sought to enable Mr. DeMarco to pursue claims against Travelers by means of the assignment. The assignment document specifically provides that Virginia Transportation and Mr. Doire agree "to cooperate fully in good faith as a material part of this Assignment" with Mr. DeMarco and his attorney in their exercise of the assignment rights and "any rights against parties *not released.*" (Emphasis added.)

It is evident to us, when we read these contemporaneously executed documents as two parts of a larger whole, that the parties sought to make it possible for Mr. DeMarco to pursue the assigned claims against Travelers (a party he *specifically excluded* from the reach of the release document) and against the retained attorney and his firm—because the insureds explicitly agreed "as a material part" of the assignment to assist Mr. DeMarco in pursuing such claims. Reading *these contemporaneously executed documents* together, we believe it is clear from their language and the care that Mr. DeMarco and his attorneys took to preserve claims against Travelers that plaintiff would not have released Travelers' insureds if he did not expressly make it part of the overall transaction that he would be free to pursue the claims assigned to him against the insurer.[52] *See Pinto*, 221 F.3d at 404 ("It defies common sense to believe that [the injured plaintiff] contemplated receiving as consideration for her release of [the insured] a right of [the insured] that no longer existed.").

In summary, it is our opinion that the release document executed by Mr. DeMarco, when read in conjunction with the

**51.** We also note that the release document states that it was made in consideration of the $550,000 payment by Travelers "and for other good and valuable consideration * * *."

**52.** We note that, in the November 7, 2006 letter from Virginia Transportation's corporate counsel to Travelers after judgment had entered against the insureds in the DeMarco personal injury action (which letter is in the record), corporate counsel informed Travelers that Mr. DeMarco appeared "willing to release your insured[s] from the judgment *in consideration of an assignment* of the claims of your insured against Travelers." (Emphasis added.) Significantly, the letter made no mention of or request for payment by Travelers from the policy proceeds in order to obtain such a release from Mr. DeMarco; arguably, the assignment itself would have been

sufficient consideration. By contrast, the same letter included a specific request for Travelers to pay $500,000 from policy proceeds to settle Mr. Woscyna's claim.

Further, although in its brief Travelers asserts that it "purchased" releases for its insureds from Mr. DeMarco and Mr. Woscyna, having obtained the releases "in exchange" for paying out the policy proceeds, at oral argument before this Court counsel for Travelers acknowledged that the insurer was *not* involved in drafting the release document executed by Mr. DeMarco (although he stated that Travelers reviewed the document after it was signed); by contrast, counsel indicated that Travelers *was* involved with drafting the release executed by Mr. Woscyna, which explicitly released Travelers from liability.

contemporaneously executed assignment document (as it should be read), did not extinguish Mr. DeMarco's right to pursue claims against Travelers as an assignee of Virginia Transportation and Mr. Doire. Accordingly, we shall give effect to the expressed intention of the parties as evidenced by the DeMarco release document and the contemporaneous assignment document. In doing so, we make note of the particular factual circumstances that are presented in this case. First, the release and the assignment were executed contemporaneously, and explicit reference is made to one document being "in consideration" of the other. Next, Mr. DeMarco clearly executed the release with the understanding that he would be able to pursue rights against Travelers as an assignee of the insureds, and there is evidence that tends to support the conclusion that Mr. DeMarco would not have released the insureds if he had not obtained an assignment of their rights. Finally, Travelers had been informed by counsel for its insureds that Mr. DeMarco would release its insureds from liability specifically in exchange for an assignment of rights so that he could pursue claims against Travelers, Travelers admitted at oral argument to having reviewed the release document, and there is no evidence that Travelers objected to the agreement.[53]

Further, in the rather unusual factual circumstances of this case, it was the alleged unreasonableness of Travelers' failure to settle with Mr. DeMarco that led to an enormous excess judgment against Travelers' insureds. There is evidence that tends to support the conclusion that the only way that Travelers' insureds could avoid further harm and that Mr. DeMarco could receive compensation was to release the insureds from liability—viz., the letters in the record to Travelers from independent counsel for Mr. Doire and Virginia Transportation and counsel for Mr. DeMarco. Accordingly, it is our view that Travelers should not now be able to avoid having to deal with Mr. DeMarco's suit for excess damages by claiming that it obtained a release for its insureds—and that therefore the insureds had no claims to assign to Mr. DeMarco—when the only reason the insureds were released from liability was that they assigned to Mr. DeMarco the very rights that he is now seeking to assert against Travelers.

Finally, we would note that, from a public policy perspective, an assignment of rights in a case such as this is "a valuable means by which the insured may obtain protection from his insurance and by which the third party may obtain compensation * * *." Stephen S. Ashley, *Bad Faith Actions, Liability and Damages*, § 7:18 at 7–68 (1997); *cf. Etheridge*, 480 A.2d at 1345 (stating, with respect to a public policy issue, that "a company that pays the loss and absolves the insured from liability, except for the right to proceed against the other carrier, has performed a function

---

**53.** The dissent suggests that our decision "subjects insurance carriers to ambush by subterfuge," stating that there is no evidence in the record that Travelers ever saw the assignment. However, the November 7, 2006 letter from Virginia Transportation's corporate counsel to Travelers reveals that the insurance company was aware that its insureds were considering such an assignment. The letter states that Mr. DeMarco appeared "willing to release your insured[s] from the judgment in consideration of an assignment of the claims of your insured against Travelers." The letter further states that, if Travelers did not pay the excess judgment entered against the insureds as a result of Travelers' failure to have settled the DeMarco claim, the insureds "may have no * * * means of avoiding the need for chapter 11 protection [other than by] the assignment of those claims," and it states that the insureds would have no choice but to resume discussions with Mr. DeMarco about the assignment.

that furthers rather than impedes public policy"). In the narrow circumstances of this case, the only way in which the insured could be protected and the third party compensated, in view of the perceived imminence of bankruptcy, was for a general release to be executed in exchange for the assignment.

The dissent accurately observes that most jurisdictions which have determined that a general release obviates an assignment of claims "have weighed serious public policy considerations regarding the potential for collusion," citing *Campione* and cases from several other jurisdictions. However, we note that, in all of those cases, the courts were addressing the risk of collusion where the assignment and release took place *before* judgment had entered against the insured.

The Supreme Judicial Court in *Campione* specifically noted that the "split in authority" among other jurisdictions with respect to whether a tortfeasor who had been released has any rights that can be assigned to the injured party "reflect a balancing of policy considerations," and it noted that the "primary rationale" of courts such as the Eighth Circuit which concluded that an insured did not have an assignable claim "is concern about the risk of collusion when an insured is protected from liability by an agreement not to execute *prior to entry of judgment*"—because, in such circumstances, the insured "loses the incentive to contest his [or her] liability or the extent of the injured party's damages either in negotiations or at trial." *Campione*, 661 N.E.2d at 662 (quoting *Freeman v. Schmidt Real Estate & Insurance, Inc.*, 755 F.2d 135, 139 (8th Cir.1985) (emphasis added)). The *Campione* case itself involved an agreement for judgment in favor of the injured party *prior* to trial, and the court observed that, because judgment had not entered against

the insured after litigation of the plaintiffs' underlying claims, "[n]either the existence of claims against [the insured], nor their value, therefore ha[d] been *established and tested in full adversary proceedings*." *Campione*, 661 N.E.2d at 662 (emphasis added). The Supreme Judicial Court in *Campione* went on to state: "We do not ignore the risk that, when a *prejudgment* settlement is combined with a release and covenant not to execute in favor of the tortfeasor, collusion may exist between the injured party and the tortfeasor." *Id.* at 663 (emphasis added). It was due to the fact that the parties had agreed to a judgment *prior* to trial that the court then felt it necessary to look at other factors, including "the seriousness of the accident, the existence of liability, and the probability that a fact finder will find that damages exceeded any existing insurance coverage," to determine that the risk of collusion in the case before it was low. *Id.* The other cases cited by the dissent similarly involved a discussion of the risk of collusion and the need to look to additional factors in determining the level of such risk, all in the context of settlement agreements reached *prior* to entry of judgment. *See Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995) ("*Prejudgment* assignments—like the one herein return for covenants not to execute are not inherently collusive or fraudulent. * * * [B]ecause insurers have available to them a variety of defenses—for example, coverage, fraud, and collusion—we fail to see why legally it should make any difference who sues the insurer—the insured or the insured's assignee.") (emphasis added); *Stateline Steel Erectors, Inc. v. Shields*, 150 N.H. 332, 837 A.2d 285, 287, 288, 289 (2003) (noting that "chief" among policy considerations of other jurisdictions "is concern about the risk of collusion when an insured is protected from liability * * * *before entry of judgment,*" but upholding

the validity of an assignment that was part of a settlement agreement in which the insured had *stipulated* to liability for a substantial judgment because the court determined that the risk of collusion was low due to the fact that the stipulated judgment in that case likely reflected actual damages); *Kobbeman v. Oleson*, 574 N.W.2d 633, 634–36 (S.D.1998) (holding that a settlement agreement reached *prior* to the entry of judgment was not "intrinsically collusive" due to the fact that, *inter alia*, the assignees in that case were required to prove their damages in court).

In our view, the possibility for the type of collusion about which most other jurisdictions have expressed concern simply did not exist in this case because the judgment against Mr. Doire was the result of a full adversarial proceeding, rather than a prejudgment settlement agreement. We are consequently satisfied that the risk of collusion was sufficiently low in the case at bar that upholding the validity of the assignment does not contravene public policy.

### 2. The Judgment Satisfied Order

█ On appeal, Travelers also contends that Mr. DeMarco's claims were extinguished by what the parties refer to as a "judgment satisfied order" that was entered in the underlying personal injury case (*see* footnote 29, *supra*). In support of this contention, Travelers has endeavored to persuade us of the existence of a linkage between the judgment satisfied order of January 3, 2007 and the language employed by the hearing justice in rendering her decision of September 23, 2008 granting plaintiff's motion for partial summary judgment.

In the just-referenced September 23, 2008 ruling on plaintiff's motion for partial summary judgment, the hearing justice indicated that Travelers was liable for the judgment in the underlying personal injury case "*to the extent that judgment remains unsatisfied.*" (Emphasis added.) The January 3, 2007 order in the underlying personal injury case states in pertinent part: "Said judgment is satisfied in full." [54] It is Travelers' contention on appeal that, by September 23, 2008 (when the decision on plaintiff's motion for summary judgment was rendered), the judgment in the underlying personal injury case had already been deemed satisfied in full for over a year and that therefore Travelers' exposure to liability had been extinguished.

A meticulous review of Travelers' summary judgment papers and the arguments advanced before the hearing justice, however, reveals that at no point in the summary judgment process did Travelers raise the issue of the effect of (or even the existence of) the judgment satisfied order. This Court has repeatedly indicated that it adheres to what is commonly called the "raise or waive" rule—*i.e.*, we do not consider issues on appeal which were not raised and properly presented during proceedings in the court below. [55] *See Ryan v.*

---

**54.** It will be recalled that the January 3, 2007 "judgment satisfied order" was entered (1) after Mr. DeMarco had released Virginia Transportation and Mr. Doire from liability and (2) after Virginia Transportation and Mr. Doire had ("in consideration of" that release) contemporaneously assigned to him any claims that they might have against Travelers (*inter alios*).

**55.** It should be observed that the raise or waive rule is not some sort of artificial or arbitrary Kafkaesque hurdle. It is instead an important guarantor of fairness and efficiency in the judicial process. We are in accord with the following observation by a distinguished appellate court regarding the federal equivalent of our raise or waive rule:

"[The] rule is not meant to be harsh, overly formalistic, or to punish careless litigators.

*Roman Catholic Bishop of Providence*, 941 A.2d 174, 184–85 (R.I.2008) ("Pursuant to our well-established raise-or-waive rule, this Court will not address arguments raised on appeal that were not presented to the trial justice for review."); *Pollard v. Acer Group*, 870 A.2d 429, 432 (R.I.2005) (describing the raise or waive rule as "one of our most well-established principles"); *see also Resendes v. Brown*, 966 A.2d 1249, 1254 (R.I.2009); *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1280 (R.I.2007).[56]

Accordingly, due to the fact that the issue of the effect of the judgment satisfied order was not raised below, it is not properly before us on appeal. We expressly abstain from expressing any view as to the possible effect of that order on future proceedings in this case after remand.

## IV

## Conclusion

For the reasons set forth in this opinion, we vacate the grant of partial summary judgment as to Travelers' liability pursuant to the principles set forth in *Asermely*, but we affirm the ruling with respect to the applicability of the rejected settlement offer statute. We remand the papers in this case to the Superior Court for further proceedings consistent with this opinion.

Justice FLAHERTY, dissenting.

I most respectfully dissent from the holding in this case for three reasons. First, the document signed by Mr. DeMarco was a general release, and no amount of legerdemain or word craft by the majority can transform it into something it is not. Second, the execution of a release by De-Marco, absolving Mr. Doire and Virginia Transportation[57] from any and all liability, effectively ended the case, leaving no claim of Doire against Travelers to be assigned. Third, the Court's holding in this case is contrary to well-defined principles of public policy.

## Is this a General Release?

A necessary underpinning to the majority's reasoning is its conclusion that the general release signed by DeMarco should not be considered to be a general release at all, but a document from which the understanding of further litigation flows. In my opinion, this holding turns our well-settled jurisprudence on the interpretation of contracts in general, and releases in particular, on its head. It is also my opinion that this decision subjects insurance carriers to ambush by subterfuge, invites collusion, and clouds the settlement of serious cases in the future.[58]

---

Rather, the requirement that parties may raise on appeal only issues which have been presented to the [trial] court maintains the efficiency, fairness, and integrity of the judicial system for all parties." *Boyers v. Texaco Refining and Marketing, Inc.*, 848 F.2d 809, 812 (7th Cir.1988).

56. A narrow exception to the "raise or waive" rule has been recognized with respect to a certain exceedingly small class of contentions that implicate constitutional rights. *See Pollard v. Acer Group*, 870 A.2d 429, 432 n. 10 (R.I.2005) ("[I]n very limited circumstances, this Court has permitted arguments concerning basic constitutional rights to be presented for the first time on appeal."). With respect

to the instant case, however, it is clear that defendant's contentions with respect to the judgment satisfied order do not meet the "strict requirements of that exception." *See State v. Russell*, 890 A.2d 453, 462 (R.I.2006).

57. While Doire and his company, Virginia Transportation, both were insureds in this case, for the ease of the reader, I refer to those parties collectively as Doire.

58. It is axiomatic that a central principle of our legal system is facilitating predictability. In its opinion today, the majority weakens that predictability by holding that a general release (which the parties did intend to serve as a *total* release of liability by one party of

It is striking to me that the majority apparently considers that there are only two parties whose interests were impacted here; DeMarco's and Doire's. This rather shortsighted view overlooks two important factors. First, the initial problem was caused by the fact that Doire had insufficient coverage to protect him from serious liability claims, and, second, Travelers paid approximately $550,000 and received a release of Doire's liability to DeMarco. DeMarco's assertion that this was a "gratuitous" payment, or that he would have signed the documents without being paid over one-half million dollars, rings hollow.

The majority purports to read the release and the assignment documents *together* to discern the intent and reach the perceived overall objective of DeMarco and Doire. To reach its conclusion, however, the majority must read each document separately, overlook the fact that the release absolved Doire of all liability, and give the assignment full effect as if the release did not exist. Moreover, there is no evidence in the record that Travelers ever saw the assignment document.

I also respectfully disagree with the majority's reliance on *Campione v. Wilson,* 422 Mass. 185, 661 N.E.2d 658 (1996), as authority for the proposition that even a general release, as opposed to an agreement not to execute on a judgment, can be combined effectively with an assignment of a bad-faith claim against an insurer.

An examination of that case reveals stark factual differences from the case before us. In *Campione,* the plaintiff-decedent was killed by the defendant's truck after his own vehicle had broken down in the breakdown lane of a highway. *Campione,* 661 N.E.2d at 659–60. Campione's estate brought a wrongful death suit against O'Donnell Sand and Gravel, Inc., and a judgment, substantially in excess of O'Donnell's insurance coverage, was entered. *Id.* at 660. In a series of documents, including an agreement for judgment, *conditional releases,* assignments, and settlement agreements, O'Donnell assigned to Campione's estate all its rights to bring an action for negligence against two insurance agents because they had not obtained adequate insurance coverage for the trucking company. *Id.* at 660–61.

A trial court dismissed the actions against the agents, but the Supreme Judicial Court reversed.[59] *Campione,* 661 N.E.2d at 659. In doing so, the court recognized that this was not a case in which an insurer was accused of bad faith after the settlement of a case, as is the case here. *Id.* at 660–61. In fact, the

the other), may not be that which it purports to be. In his article on Sir Edward Coke and the origins of judicial review, Allen Dillard Boyer noted:

" 'Certainty is the mother of quietness and repose,' [Coke] wrote. On another occasion he noted that '[i]t is a miserable bondage and slavery when the law is wandering or uncertain.' * * *

"The certainty to which Coke aspires is not the specious certitude of the legal metaphysician. Rather, it looks toward the economist's observation that the definition of rights is necessary for orderly commerce, because only what is clearly defined can be accurately valued or meaningfully exchanged. From the legal perspective, this

ordering is reflected in the ability of attorneys and clients *to predict the resolution of foreseeable disputes."* Allen Dillard Boyer, *"Understanding, Authority, and Will":* Sir *Edward Coke and the Elizabethan Origins of Judicial Review,* 39 B.C. L.Rev. 43, 59 (1997) (emphasis added) (quoting Sir Edward Coke, Preface to 6 Reports (1607)).

**59.** In so doing, the court recognized that most courts balance policy considerations when deciding suits premised on this type of maneuvering, especially in light of the risk of collusion. Public policy rationales in cases involving assignments and releases or covenants not to execute are discussed *infra.*

carrier, which had paid out its entire policy in the underlying wrongful death case, was not even a defendant in the action precipitated by the assignment to *Campione*. *Id.* at 661. Rather, it was the independent agents who were alleged to be negligent because they had secured a policy with inadequate coverage for O'Donnell. *Id.* at 660, 661–62. For these reasons, *Campione* is not particularly relevant to the case before us.

The majority also relies heavily on *Pinto v. Allstate Insurance Co.*, 221 F.3d 394 (2nd Cir.2000). In that case, an excess verdict was returned against an insured after the carrier stubbornly refused to settle a personal-injury claim brought by a single claimant within the insured's policy limit. *Id.* at 396–98. The injured party and the insured exchanged a general release and assignment of the insured's bad-faith claim against his carrier. *Id.* at 398.

In deciding against the carrier, the Second Circuit noted that the normal way to preserve such a claim was by a covenant not to execute, and not by a general release. *Pinto*, 221 F.3d at 403. However, observing that New York's highest court had not addressed the issue, the Second Circuit then predicted that the Court of Appeals for the State of New York probably would hold that it was appropriate to give force and effect to the intent of the parties, even if their intentions were diametrically opposed to what they said in the settlement documents.[60] *Id.* at 403–04.

The *Pinto* case is clearly in the minority, and I cannot accept its reasoning.

Our well-settled rules of contractual interpretation require that the intent of the parties is best determined by the wording of the documents that they drafted, agreed upon, and executed. *See Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 581 n. 10, 410 A.2d 986, 991 n. 10 (1980) ("[T]he intent [the Court] seek[s] is not some undisclosed intent that may have existed in the minds of the contracting parties but is instead the intent that is expressed in the language of the contract.") (citing *Theroux v. Bay Associates, Inc.*, 114 R.I. 746, 339 A.2d 266 (1975); *Flanagan v. Kelly's System of New England, Inc.*, 109 R.I. 388, 286 A.2d 249 (1972)). Only when the document is absurd on its face (and no one has raised that argument here) or ambiguous do we rely on extrinsic factors to give context to the parties' intent.[61] *See Gorman v. Gorman*, 883 A.2d 732, 739 n. 11 (R.I.2005) ("Under established contract law principles, when there is an unambiguous contract * * *, the terms of the contract are to be applied as written."); *Mallane v. Holyoke Mutual Insurance Co. in Salem*, 658 A.2d 18, 20 (R.I.1995); *Aetna Casualty & Surety Co. v. Sullivan*, 633 A.2d 684, 686 (R.I.1993).

Those rules apply in particular to releases; this Court consistently has applied the same rules of construction to release documents as it has to other forms of contractual agreements. *See Young v. Warwick*

---

**60.** The dissenting justice in that case said that he was not surprised that there was no New York law on what appeared to him to be such an obvious question, and that the majority's conclusion served to create value in the assignment. *Pinto v. Allstate Insurance Co.*, 221 F.3d 394, 409 (2nd Cir.2000) (Jacobs, J., dissenting). Characterizing the majority's holding as "alchemy," the dissent noted that the Court cited "no authority from *any* jurisdiction to support its view that the excess judg-

ment survives the release for *any* purpose." *Id.*

**61.** In working its way to its conclusion, the majority has extracted from the record several correspondences (only some of which are contemporaneous to the assignment and release), and, in my opinion, inappropriately used them to deduce the intent of the parties when they executed the assignment and release.

*Rollermagic Skating Center, Inc.,* 973 A.2d 553, 558 (R.I.2009) ("A release is a contractual agreement, and the various principles of the law of contracts govern the judicial approach to a controversy concerning the meaning of a particular release.").

In attempting to divine the possible motives of DeMarco and Doire and further in construing the language of the DeMarco release and assignment together, the majority reaches a conclusion that is hostile to our well-settled precedent. I respectfully disagree with the majority's conclusion that this is a case of form over substance; the essence of the substance is the release, which in clear language absolved Doire from any and all liability. DeMarco does not dispute that he intended to completely release Doire from liability from the excess judgment, nor does either party disagree that Doire assigned any claims he might have against his insurer to DeMarco. Instead, the vexing problem that remains is that DeMarco, an assignee who merely stands in the shoes of Doire, has no remaining claim to pursue against Travelers because the general release vitiated that claim. Although I am sympathetic to DeMarco's plight, the future implications of construing a general release as something other than a general release are too significant to ignore.

### What Was Assigned?

In the event that a claim is made against an insured, the carrier must defend and indemnify the insured for any judgment entered against the insured to the extent of its policy limit. *See* 3 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Edition,* § 16.06[1] at 16–145 (Lexis-Nexis 2010) ("Liability insurers are often said to have two principal contractual duties: the duty to defend and the duty to indemnify. * * * The duty to defend refers to the insurer's obligation to pay the expense of defending its policyholder in a lawsuit. * * * The duty to indemnify, by contrast, refers to the insurer's obligation to pay damages awarded against its insured."). The duties of the insurer are contractual in nature; however, this Court has held, and the majority correctly affirms in this case, that the insurer also is burdened with a fiduciary duty to refrain from placing its own interest ahead of that of the insured, and to endeavor in good faith to resolve claims against its insured within the limits of the policy coverage, thereby avoiding uncovered risk to the insured. *Asermely v. Allstate Insurance Co.,* 728 A.2d 461, 464 (R.I.1999); *Medical Malpractice Joint Underwriting Association of Rhode Island v. Rhode Island Insurers' Insolvency Fund,* 703 A.2d 1097, 1102 (R.I.1997). As the majority has adroitly reasoned, that burden becomes exponentially more difficult when, as was the situation here, there are multiple substantial claims that threaten to exhaust policy resources. *See Peckham v. Continental Casualty Insurance Co.,* 895 F.2d 830 (1st Cir.1990); *Asermely,* 728 A.2d at 464.

What occasions my departure from the majority's reasoning here, however, is the fact that both claimants, DeMarco and Mr. Woscyna, released the insured, Doire, from any and all claims. Thus, Travelers fulfilled its two duties under its contract of insurance. It is beyond dispute that Travelers owed no duty to DeMarco, a stranger to the insurance contract; and in making any claim against the carrier, DeMarco must stand in the shoes of Doire.

There is no question that, in some circumstances, an insured properly may assign claims that it may have against its carrier to another. In *Mello v. General Insurance Co. of America,* 525 A.2d 1304, 1306 (R.I.1987), this Court held that an insured's bad-faith claim against her insurer could be assigned to a claimant. But, it

is significant to note that in *Mello*, a case that was decided before this Court's adoption of the new rule set forth in *Asermely*, there had been no release of the insured's liability. *See Mello*, 525 A.2d at 1305. In *Mello*, the insurer had refused to settle a claim brought by a single claimant for a sum that was within the policy limit. *Id.* When a jury returned a verdict against the insured that exceeded the insured's coverage, the carrier simply satisfied the verdict to the extent of its coverage and walked away, leaving the insured personally exposed to the remainder of the judgment. *Id.* The insured then assigned its rights against its own carrier to the judgment creditor, who promptly brought suit against the carrier. *Id.* A hearing justice of the Superior Court granted summary judgment to the insurer, reasoning that the bad-faith claim was a personal injury that could not be assigned. *Id.*

On appeal, this Court reversed and vacated the judgment. *Mello*, 525 A.2d at 1306. We held that "in certain limited circumstances the insured's right may be assigned. The facts of the case at bar constitute such limited circumstance." *Id.* In deciding in favor of the assignee, the Court further said:

> "We believe that within the facts of this case this assignment was justified. We therefore hold that an insured may assign its bad-faith claim against its insurer to the insured claimant for the limited purpose of recovering the difference between the judgment received against the

insured and the insurance-policy limits." *Id.*

The situation confronting the Court in *Mello* was dramatically different from the situation present in this matter because in that case the claimant had not signed a release, and, therefore, the insured still was exposed to the claimant for a substantial excess judgment.[62] Those facts are simply not present here. DeMarco has released Doire from any and all liability, fully and unconditionally, leaving Doire altogether "off the hook." [63]

I agree with the many courts that have drawn a distinction between the permissible assignment of those cases resolved by a covenant not to execute on a judgment, as was the case in *Mello*, and a general release, as is the case here. *See, e.g., Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 529 (Iowa 1995) ("[A] covenant not to execute * * * is merely a contract, and *not a release*, such that the underlying tort liability remains and a breach of contract action lies if the injured party seeks to collect its judgment. Thus, the tortfeasor is still 'legally obligated' to the injured party, and the insurer still must make good on its contractual promise to pay.") (emphasis added); *Stateline Steel Erectors, Inc. v. Shields*, 150 N.H. 332, 837 A.2d 285, 290–91 (2003) (holding that summary judgment in favor of the insurer was improper because insured and third party executed an assignment accompanied by a covenant not to sue, rather than a release, and noting that "[u]nlike a release, a cove-

---

**62.** The claimant in *Mello v. General Insurance Co. of America*, 525 A.2d 1304, 1306 (R.I. 1987), agreed not to levy execution on the judgment against the insured in exchange for the insured's assignment of his claim against the insurer. A covenant not to execute is notably distinct from a general release because the executing party does not relinquish his right to execute on the judgment but merely refrains from enforcing it. On the other hand, a releasor explicitly gives up both

present and any future rights against the released parties.

**63.** The *Mello* Court and the majority in this case both rely on *Etheridge v. Atlantic Mutual Insurance Co.*, 480 A.2d 1341 (R.I.1984); but in that case, there also was no release absolving the insured from further liability of any kind.

nant not to sue does not relinquish a right or claim, or extinguish a cause of action") (internal quotation marks omitted); *Kobbeman v. Oleson,* 574 N.W.2d 633, 636 (S.D. 1998) (considering whether to give effect to a covenant not to execute accompanied by an assignment and concluding that "[t]he most pragmatic approach looks to the language of the covenant to find whether a tortfeasor remains legally obligated on a judgment") (citing *Lancaster v. Royal Insurance Co. of America,* 302 Or. 62, 726 P.2d 371, 372 (1986)).[64]  When, as here, a general release has been executed in favor of the insured, there simply is nothing left to be assigned.

## Public Policy Considerations

In its decision in this case, the majority places itself squarely within the minority of jurisdictions that have addressed this issue. The majority of jurisdictions addressing the issue have decided explicitly or implicitly that a general release extinguishes all liability and thereby obviates any assignment of claims by the insured to another party. *See, e.g., Red Giant Oil Co.,* 528 N.W.2d at 529; *Stateline Steel Erectors, Inc.,* 837 A.2d at 290–91; *Lancaster,* 726 P.2d at 372; *Kobbeman,* 574 N.W.2d at 636. In arriving at their decisions, most of those jurisdictions have weighed serious public policy considerations regarding the potential for collusion.[65]  *See, e.g., Red Giant Oil Co.,* 528 N.W.2d at 530 (determining that a covenant not to execute on a judgment entered against tortfeasor in exchange for an as-

signment of the tortfeasor's claims against an insurance agent was not inherently collusive because it could be set aside if the agent raised and proved collusion as a defense); *Stateline Steel Erectors, Inc.,* 837 A.2d at 288–89 (upholding an assignment of rights accompanied by a covenant not to sue in part because the risk of collusion was low); *Kobbeman,* 574 N.W.2d at 636–37 (holding that a settlement between the injured party and the insured that included a covenant not to execute and assignment of insured's cause of action against insurance agents was not "intrinsically collusive").

Those public policy considerations are particularly illuminated by the facts present in this case. Here, DeMarco had obtained a $2.8 million judgment against Doire. There is no question that Travelers was faced with the contractual obligation to pay the remainder of its policy, $550,000, to DeMarco in partial satisfaction of the judgment. It is further indisputable that had that been done, and in the absence of a release, DeMarco was free to obtain an assignment of whatever viable claim Doire may have had against Travelers.

It is very clear from the record that Doire and DeMarco had an amicable relationship both before and after the accident, and that DeMarco executed a general release of liability as an accommodation to Doire so that Doire could avoid bankruptcy. Indeed, DeMarco's memorandum of law accompanying his motion for summary judgment noted the following:

64.  The majority observes that these cases involve instances in which the assignment and release (or covenant) was executed *prior* to the entry of judgment in the underlying case. While this is an accurate observation, I do not think that the risk of collusion evaporates simply because judgment has been entered, as occurred here. It is, therefore, a distinction without any rational difference.

65.  Indeed, when it approved of the assignment in *Campione,* the Supreme Judicial Court acknowledged that most courts balance policy considerations when deciding similar suits and specifically cited the low risk of collusion given the facts in that case. *Campione v. Wilson,* 422 Mass. 185, 661 N.E.2d 658, 661 n. 10 (1996).

"DeMarco negotiated a resolution with [Doire] and its corporate counsel that in exchange for an assignment of all [Doire's] rights against Travelers * * * and others, DeMarco would execute a release in favor of [Doire] *so that* [Doire] *could avoid having to file bankruptcy.* Travelers *was not involved* in the negotiations between [Doire] and DeMarco, nor was it ever released." (Emphases added.)

In my opinion, this is the very type of collusion that forms the basis for distinguishing between covenants not to execute and general releases of liability. In disregard of the sound public policy forbidding assignments accompanied by the execution of a general release, this Court's decision in this case invites linguistic gamesmanship between nominally adverse but nonetheless cooperating parties to a lawsuit. Inevitably, it will make the settlement of serious cases in which adequate insurance coverage is an issue much more difficult.

### Conclusion

For the reasons set forth above, I would have vacated the judgment in favor of DeMarco and ordered the entry of judgment in favor of Travelers.

### APPENDIX

## GENERAL RELEASE

KNOW ALL MEN, THAT WE, WAYNE DEMARCO, LEESA DEMARCO, BRAEDYN DEMARCO and CHAYCE DEMARCO (collectively, the "Releasors"), in consideration of the sum of $550,000.00 (Five Hundred Fifty Thousand 00/100) Dollars to be paid by Travelers Insurance Company of America, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, do hereby remise, release, and forever quit-claim unto said LEO H. DOIRE and VIRGINIA TRANSPORTATION CORP., a Rhode Island corporation, their successors and assigns (collectively, the "Releasees"), any and all manners of action, causes of action, debts, dues, claims and demands, both in law and equity which against said Releasees said Releasors ever had, now have, or in the future may have for or by reason or means of any matter or thing from the beginning of the world to the day of the date of these presents including, without limitation, any and all loss, damage or claim arising out of the subject matter of the litigation brought by the Releasors against Releasees in the Providence County Superior Court being Civil Action No. 04-1171 (the "Litigation"), and any verdict or judgment entered in the Litigation.

This General Release shall not in any way be construed, nor is it intended, to release Travelers Insurance Company of America, Travelers Indemnity Company, Travelers St. Paul, Travelers Insurance Company, or any of its affiliates (collectively, "Travelers") from any and all claims that Releasors may have against Travelers in any way arising from the Litigation or any aspect thereof. The same are specifically reserved by Releasors.

## APPENDIX A

THIS GENERAL RELEASE shall be deemed to be made under and shall be governed by and construed and enforced in accordance with the laws of the State of Rhode Island, without reference to conflict of law rules.

WITNESS:

_____     _____
                                     WAYNE DEMARCO, Individually

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, on the 17th day of November, 2006, before me personally appeared Wayne DeMarco, to me known and known by me to be the person executing the foregoing instrument, and he acknowledged said instrument by him executed to be his free act and deed.

_____
Notary Public
Print Name: Steven DeLuca
My Commission Expires: 7/8/9

WITNESS:

_____     _____
                                     LEESA DEMARCO, Individually

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, on the 17th day of November, 2006, before me personally appeared Leesa DeMarco, to me known and known by me to be the person executing the foregoing instrument, and she acknowledged said instrument by her executed to be her free act and deed.

_____
Notary Public
Print Name: Steven DeLuca
My Commission Expires: 7/8/9

## Assignment

For good and valuable consideration and in consideration of the General Release executed contemporaneously herewith , the receipt and adequacy of which are hereby acknowledged, the undersigned, Leo Doire, individually, and Virginia Transportation Corp., a Rhode Island corporation, and each of them (collectively, the "Assignors"), do hereby assign to Wayne DeMarco, Leesa DeMarco, Chayce DeMarco and Braedyn DeMarco, and each of them (collectively, the "Assignees") all of the rights, title and interests of Doire and Virginia and each of them in and to any and all claims and causes of action that either or both of them may have, including any and all rights to indemnity, contractual or equitable, which they now have, or ever had, against each of Travelers and counsel provided to Doire and Virginia by Travelers, being Michael DeLuca and the firm of Gidley, Sarli & Marusak, LLP ("appointed counsel") in any way related to the conduct of Travelers in the handling of the claims of the Assignees, at all times subsequent to the motor vehicle accident that resulted in the litigation brought in the Providence County Superior Court entitled Wayne DeMarco et al vs. Leo H. Doire and Virginia Transportation Corp., Civil Action No. 04-1171(the "litigation") and the manner in which Travelers and appointed counsel discharged their respective obligations to Doire and Virginia, including but not limited to all claims for fraud, breach of contract, breach of all duties of good faith and fair dealing, bad faith, further including but not limited to any and all Asermely claims, so called, malpractice and negligence. This Assignment shall also operate to assign to the Assignees any and all claims that the Doire and Virginia may have against any insurance agents or insurance professionals.

Assignors agree to cooperate fully in good faith as a material part of this Assignment with the Assignees and their counsel in efforts to exercise these assigned rights as well as any rights against parties not released.

This Assignment shall be deemed to be made pursuant to and governed by and construed and enforced in accordance with the laws of the State of Rhode Island, without reference to conflict of law rules.

IN WITNESS WHEREOF, each of the Assignors has caused this Assignment to be duly executed as of the 17th day of November, 2006.

WITNESS:

_____

_____ 11/17/06
Leo Doire

(signatures continued on next page)

APPENDIX B

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence in said county on the 17th day of November, 2006, before me personally appeared Leo H.C. Doire, to me known and known by me to be the party executing the foregoing instrument and he acknowledged said instrument by him executed to be his free act and deed.

Notary Public

Print Name: _Steven DeLuca_

My Commission Expires: _7/8/9_

WITNESS:

Virginia Transportation Corp.

By _____ 14/17/06
Leo H. C. Doire
President

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence in said county on the 17th day of November, 2006, before me personally appeared Leo H.C. Doire, President of Virginia Transportation Corp., to me known and known by me to be the party executing the foregoing instrument for and on behalf of Virginia Transportation Corp., and he acknowledged said instrument by him executed to be his free act and deed in said capacity and the free act and deed of Virginia Transportation Corp..

Notary Public

Print Name: _Steven DeLuca_

My Commission Expires: _7/8/9_